### In the Interest of Ramona HARE, A Child.

#### No. 8735.

Court of Civil Appeals of Texas, Texarkana.

May 6, 1980.

Cleatus M. Phelan, McKinney, for Dixie Estes.

Charles Hare pro se.

David K. Haynes, Collin County Dept. of Human Resources, for appellee.

George C. Roland, Jr., McKinney, guardian ad litem for Ramona Hare.

CORNELIUS, Chief Justice.

This is an appeal by Dixie Estes and Charles Hare from an order of the District Court of Collin County terminating their parental rights in Ramona Hare, a fourteen year old girl. Trial was to a jury which found that both Mrs. Estes and Mr. Hare had committed the acts described in Subparagraphs (D) and (E) of § 15.02(1) of the Tex.Family Code Ann. (Supp.1980), and that the best interest of the child would be served by terminating both parent-child relationships. Based upon the verdict, the court terminated the parental rights and appointed the Collin County Department of Human Resources as managing conservator of Ramona. Both Mrs. Estes and Mr. Hare, as appellants, challenge the sufficiency of the evidence to support the verdict.

Tex.Family Code Ann. § 15.02 (Supp. 1980) provides in part as follows:

"A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

. . . . .

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; or

.    .    .    .    .

(2) termination is in the best interest of the child."

Testimony at the trial revealed the following facts: Ramona was born on December 19, 1966, in Baltimore, Maryland. Dixie Estes, her mother, had left her first husband, Bill Estes in 1965, and shortly thereafter met Charles Hare. During the early part of 1966, she found she was pregnant and assumed that the child was Mr. Hare's, although she was seeing both her husband and Mr. Hare at the time. In 1969, after Mr. Estes had divorced her, Dixie married Mr. Hare. In 1969, while they were living in North Carolina, Dixie was arrested for confrontation with an officer. She testified that at the time of the incident she was stooping in the middle of the street to change Ramona's diaper when she was confronted by police officers who evidently thought she was intoxicated. An argument ensued and she was arrested and Ramona was placed temporarily in a foster home. Dixie was not convicted of the charge and later regained custody of Ramona. Later that year Ramona was again placed in a foster home for a short time based upon allegations of Dixie's intoxication, but was later returned to her mother. In the early 1970's, Charles and Dixie moved to McKinney, Texas, and lived there without incident until February of 1974 when Ramona was placed in foster care pending an investigation of allegations arising during a divorce action pending between Charles and Dixie. On one occasion Dixie was driving with Ramona and went off the road at a sharp curve near their home. Ramona flagged down a neighbor who was driving by at the time, and was taken to the police station and placed in foster care overnight. Dixie admitted to drinking a beer prior to the incident, but denied that she was intoxicated. She was not convicted of intoxication and there is no positive proof in the record that she was in that condition. On April 15, 1974, the divorce suit was dropped. In June of that year the Child Welfare Unit received complaints that Charles Hare, in a fit of anger, had hit Ramona, and that there were insects on the eating utensils and table in the home. The welfare unit workers contacted the parents who agreed to attend counseling sessions. In 1976 Charles and Dixie again filed for divorce. On September 5, 1976, Dixie was arrested for drinking and Ramona was placed in an emergency foster home for two days because the authorities were unable to locate Charles. On March 4, 1977, the divorce became final, but Charles continued for some time to live in the same house with Dixie and Ramona, working at night and caring for Ramona during the day while Dixie worked. On July 2, 1977, Charles and Dixie got into another argument, and Ramona phoned the police who came and arrested both of them. The officer who made the arrest testified that Ramona had been hurt when her mother fell on the girl's arm during the argument. He also testified that both Dixie and Charles appeared to be drunk and that he told them they would both be arrested if they did not quit fighting.

In December of 1977 Ramona was again placed in a foster home. She had gone to a neighbor's house and called the police and told them that her parents were intoxicated. The police went to the home and arrested Dixie and charged her with public intoxication, but she was subsequently found not guilty of the charge. That same month Charles moved out of the house.

Viewed as a whole the evidence reveals a turbulent atmosphere at Ramona's home. Charles and Dixie fought frequently and bitterly with verbal and physical violence inflicted by both. However, there is little evidence of any abuse or violence being directed toward Ramona. Instead of any intentional abuse being directed at her, the record indicates an entirely contrary view, i. e., that both parents love their daughter, but possibly because of jealousy of or hatred for each other, created an environment

that the child welfare unit felt was harmful to Ramona. Dixie admitted that her conflicts with Charles might have endangered Ramona's emotional stability, but she testified that when she was not around Charles she did not have the problems that caused an unstable home. Wayne Hale, a social worker for the Welfare Unit, testified that the turmoil in the family was the basis for the termination proceedings, but he admitted that he was aware of no evidence that either Dixie or Charles ever abused Ramona.

The trial judge, who heard this case prior to the decision in *In Re G____ M____*, 596 S.W.2d 846 (1980), applied the preponderance of the evidence standard of proof, as required by § 11.15 of the Tex. Family Code Ann., and rendered judgment on the jury verdict. But in *In Re G____ M____*, supra, the Texas Supreme Court held that, § 11.15 notwithstanding, the natural right existing between parents and their children is one of constitutional dimensions and that termination of such parental rights is of such gravity and consequence that due process requires the state to justify it by proof more substantial than a preponderance of the evidence. Clear and convincing evidence is required. A careful review of the statement of facts in this case convinces us that the proof adduced at the trial did not rise to that standard, and is therefore insufficient to sustain the judgment under the rule set out in *In Re G____ M____*, supra.

The judgment is therefore reversed and the cause is remanded to the trial court for a new trial.