## MILTON STANDKE AND OTHERS v.
## B. E. DARBY & SONS, INCORPORATED.

193 N. W. (2d) 139.

December 3, 1971—Nos. 42676-42690.

*Loren M. Barta* and *William J. Nierengarten,* for appellants.

*Nelson, Casey, Tripp & Dow, Harold S. Nelson, Byron J. Casey, Levitt, Palmer, Bowen, Bearmon & Rotman, Robert M. Bowen,* and *R. F. Hollender,* for respondent.

Heard before Knutson, C. J., and Murphy, Otis, Kelly, and Odden, JJ.

KELLY, JUSTICE.

Appeal from summary judgment entered in favor of defendant in an action alleging that defendant, B. E. Darby & Sons, Incorporated, had defamed plaintiffs by publishing a newspaper editorial critical of the actions of the grand jury on which plaintiffs had served. The judgment is affirmed.

On November 1, 1968, there was convened a Steele County Grand Jury composed of plaintiffs herein and others. Before its discharge on April 9, 1969, the jury met seven times. It returned no bills or presentments, and the only report it made to the court was in November 1968, prior to the time of its adjournment. No report was made at the time of its discharge.

Apparently, previous Steele County grand juries had investigated the county nursing home, the courthouse and the county jail and had filed reports of their investigations.[1] The grand jury of which plaintiffs were members made no such reports, however, and did not investigate the county nursing home, although it appears that the conditions at the nursing home had been the object of some public controversy during the term of the grand jury and a referendum for a bond issue for a new nursing home had failed to pass.

---

[1] Under Minnesota law, Minn. St. 628.61, a grand jury is charged, in addition to its functions concerning presentments and indictments, with responsibility to inquire:

"(1)  Into the condition of every person imprisoned on a criminal charge triable in the county, and not indicted;

"(2)  Into the condition and management of the public prisons in the county; and

"(3)  Into the wilful and corrupt misconduct in office of all public officers in the county."

On April 16, 1969, defendant published an editorial which criticized the failure of the grand jury to file a report on the condition of the county's public buildings:

"The jury met on a couple of occasions, took some testimony and managed a couple of meals at county expense, but no report was made on its service.

"It did not even bother with the customary—or is it a legally spelled out—requirement that all public buildings be inspected and a report of findings given."

The editorial was written by Gerald Ringhofer, the executive editor of the Owatonna People's Press, and concluded that the jury "did not keep the faith with Steele County residents." It appears that, before publishing the editorial, Ringhofer had made some investigations into the function of the grand jury. He examined reports which had been filed by previous Steele County grand juries, inquired of the clerk of court whether the present jury had filed such a report, and examined records in the office of the county auditor to determine when the grand jury had met and what expenses had been incurred. The editorial was not published until after the final adjournment of the jury.

Following publication of the editorial, the jurors served the newspaper with a demand for retraction. On April 23, 1969, the newspaper published a second editorial entitled, "We were Mistaken," stating that a grand jury was not required to make a report of its findings, but still expressing regret that the jury had not reported on the jail or the rest home, "because we believe that county residents are concerned about these facilities, and with just cause."

All 22 of the grand jurors commenced separate libel actions against defendant which subsequently were consolidated for proceedings in the district court. The complaints alleged that statements contained in the first editorial were defamatory, and that they were known by defendant to be false or had been published with reckless disregard of whether they were false.

After a lengthy exchange of affidavits, depositions, and mo-

tions, defendant moved for summary judgment on the basis of affidavits and other documentary evidence. The court ordered summary judgment, basing its order on findings that grand jurors are "public officials" such that a libel action brought by them could not stand unless false and defamatory material regarding their official conduct had been published with "actual malice." ("Actual malice" is used throughout this opinion to mean with knowledge that it was false or with reckless disregard of whether or not it was false.) The court found that the editorial statements had been made without actual malice, and accordingly ordered summary judgment.

The questions presented on this appeal are: (1) Whether, for purposes of standing as plaintiffs in a libel suit, grand jurors are to be considered "public officials" or "public figures" within the meaning of the policy developed in New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. ed. 2d 686, 95 A. L. R. 2d 1412 (1964); (2) if grand jurors are not considered to be "public officials" or "public figures," whether the utterance in question involves an issue of public or general concern within the meaning of Rosenbloom v. Metromedia, Inc. 403 U. S. 29, 91 S. Ct. 1811, 29 L. ed. 2d 296 (1971); and (3) if either or both issues (1) and (2) are decided in the affirmative, whether the trial court was justified in finding that the allegedly defamatory material had been written without "actual malice."

■ ARE GRAND JURORS PUBLIC OFFICIALS OR PUBLIC FIGURES? Under the law developed in New York Times and subsequent cases, the scope of the terms "public official" and "public figure" is quite broad. Although we have found no decisions involving grand jurors in this context, it is clear under the New York Times doctrine that, in view of the public interest in the performance of functions delegated by law to the grand jury, the interests of free and open discussion demand that grand jurors in this case must be considered public officials or figures.

We reach this conclusion with some reluctance for we are aware that grand jurors do not acquire their status voluntarily

and that, unlike most political figures to whom the doctrine of New York Times has been held to apply, grand jurors have no easy access to the media for purposes of rebuttal. Indeed, in some instances they may be under a legal disability to rebut erroneous statements made concerning the operations of the grand jury.[2] Nonetheless, under decisions of the United States Supreme Court, we feel compelled to conclude that New York Times requires that grand jurors be considered public officials or public figures for purposes of maintaining libel actions.

Since New York Times Co. v. Sullivan, *supra,* state laws of libel have been severely limited in situations in which the victim of libelous attack is a public official. The New York Times case set forth the rule that "public officials" can recover damages for libel only if it is shown that the publication of false and defamatory statements regarding their official conduct was prompted by actual malice.

This court has twice had occasion to consider application of New York Times to specific factual situations. In Rose v. Koch, 278 Minn. 235, 154 N. W. 2d 409 (1967), a judgment for libel was reversed on the ground that the suit brought by Arnold Rose, a University of Minnesota professor of some prominence and a former state legislator, fell within the New York Times rule so that the publication of untrue statements was privileged unless prompted by actual malice.

In Mahnke v. Northwest Publications, Inc. 280 Minn. 328, 160 N. W. 2d 1 (1968), the court affirmed a libel judgment awarded a Minneapolis police officer. It apparently was conceded that the

---

[2] Minn. St. 628.64 provides: "Every grand juror shall keep secret whatever he himself or any other grand juror said, or in what manner he or any other grand juror voted on a matter before them."

Minn. St. 1967, § 628.68 provided in part: "Every * * * grand juror, * * * who, except when lawfully required by a court or officer, shall wilfully disclose any evidence adduced before the grand jury, or anything which he himself or any other member of the grand jury said, or in what manner he or any other grand juror voted upon any matter before them, shall be guilty of a misdemeanor."

policeman was a "public official," but the judgment was nevertheless affirmed on the ground that the evidence was sufficient to sustain a finding that the publication had been made with reckless disregard of whether or not it was false.

In the present case, it must be determined whether the plaintiff grand jurors are public officials or public figures so that the New York Times privilege is operative. It should be observed that under the New York Times approach, determination of whether a person is a public official is made by a subjective constitutional standard, not by reference to state law standards:

"* * * [W]e reject at the outset * * * that [the question whether a person's status as a public official] should be answered by reference to state-law standards. States have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection. If existing state-law standards reflect the purposes of New York Times, this is at best accidental." Rosenblatt v. Baer, 383 U. S. 75, 84, 86 S. Ct. 669, 675, 15 L. ed. 2d 597, 604 (1966).

The Rosenblatt decision, in holding that a former supervisor of a county recreation area fell within the public official class, suggested that the determination was to be made by reference to two considerations: "* * * [F]irst, [the] strong interest in debate on public issues, and, second, [the] strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." 383 U. S. 85, 86 S. Ct. 675, 15 L. ed. 2d 605. The court there avoided setting limits upon the class of persons included in the "public official" designation, stating that "the 'public official' designation applies *at the very least* to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Ibid. (Italics supplied.)

Under that general approach, we conclude that grand jurors must be considered to fall within the class of persons criticism of whom falls within the New York Times privilege. A grand

jury is a body which is clearly governmental in character. Even though composed of private citizens who, in essence, have been conscripted for the duty, it nonetheless holds and exercises powers which are governmental in nature. It accuses, by way of indictment or presentment, persons implicated in crime. Minn. St. 628.02. In addition, it has investigatory powers, including the power to investigate on its own initiative situations where it has reason to believe a public offense has been committed. § 628.60. Finally, under Minnesota law the grand jury is charged with the duty of inquiring into the conditions of prisoners and prisons, and into questions of corrupt misconduct on the part of public officers. § 628.61.

In view of these powers which by law are delegated to the grand jury, it is clear that the body must be considered governmental in nature and must therefore fall within the general statement made by the United States Supreme Court in Rosenblatt: "Criticism of government is at the very center of the constitutionally protected area of free discussion." 383 U. S. 85, 86 S. Ct. 675, 15 L. ed. 2d 605. Accordingly, criticism of the grand jury seemingly must fall within the New York Times privilege. Similarly, criticism of its component members must fall within the "public official" designation of New York Times as long as such criticism is limited to official, and not private, activities of the persons involved.

Moreover, recent decisions of the United States Supreme Court have made it clear that the privilege may apply if a person is not a "public official" but merely a "public figure." It is now clear that the privilege of New York Times extends to nongovernmental figures in whose activities there is a legitimate public interest. Such may be the case when a person, through his activities, voluntarily places himself in a position in which the public interest demands that press criticism be privileged. Curtis Pub. Co. v. Butts, 388 U. S. 130, 87 S. Ct. 1975, 18 L. ed. 2d 1094 (1967); Pauling v. Globe-Democrat Pub. Co. 362 F. 2d 188 (8 Cir. 1966), certiorari denied, 388 U. S. 909, 87 S. Ct. 2097, 18

L. ed. 2d 1347 (1967). In the Pauling decision, written by Mr. Justice Blackmun, the court observed that nongovernmental public figures may possess influence equal to or greater than that of many public officials; hence, the difference of terminology is said not to provide a rational distinction. 362 F. 2d 196. Moreover, Time, Inc. v. Hill, 385 U. S. 374, 87 S. Ct. 534, 17 L. ed. 2d 456 (1967), suggested that, even though a person is exposed to public view wholly involuntarily, the privilege may still obtain. That view has recently been reinforced by the court's decision in Rosenbloom v. Metromedia, Inc. *supra,* in which it reversed a libel judgment awarded to a Philadelphia magazine distributor against a radio station which had falsely described him as a "Smut Merchant."

Thus, it seems that so long as there is a strong public interest in an activity, the New York Times privilege is operative even though the persons involved may not be involved by choice. The privilege particularly obtains where the activity is governmental in nature and where the persons subjected to criticism are in a position to influence public policy or decisions. See, e. g., Greenbelt Coop. Pub. Assn., Inc. v. Bresler, 398 U. S. 6, 90 S. Ct. 1537, 26 L. ed. 2d 6 (1970). That description readily applies to the situation presented in this case since the grand jurors, by virtue of their official powers, are in a position to exercise influence over matters of public concern. Hence, for purposes of the New York Times rationale, the grand jurors must be considered either "public officials" or "public figures."

■ WAS THE EDITORIAL OF PUBLIC OR GENERAL CONCERN? The second issue—whether the editorial in question involved an issue of public or general concern—is clearly raised because of the recent decision by the United States Supreme Court in Rosenbloom v. Metromedia, Inc. *supra,* decided after the decision of the court below.

In Rosenbloom, Mr. Justice Brennan stated:

"It is clear that there has emerged from our cases decided since New York Times the concept that the First Amendment's

impact upon state libel laws derives not so much from whether the plaintiff is a 'public official,' 'public figure,' or 'private individual,' as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, The System of Freedom of Expression 531-532, 540 (1970). In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases." 403 U. S. 44, 91 S. Ct. 1820, 29 L. ed. 2d 312.

Mr. Justice White in a specially concurring opinion in Rosenbloom made this interesting analysis of the probable future decision of at least five members of the Supreme Court in actions for libel:

"* * * [I]t would seem that at least five members of the Court would support each of the following rules:

"For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error. In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited." 403 U. S. 59, 91 S. Ct. 1827, 29 L. ed. 2d 320.

It is obvious that the Rosenbloom case has definitely added another dimension to the rules restricting recovery for libelous falsehoods. This dimension has been emerging for some time, and to some degree has been intertwined in New York Times and subsequent United States Supreme Court decisions. The court in Rosenbloom announced that the determinative factor in applying the First Amendment to state libel actions is whether the utterances in question involve an issue of public or general con-

cern. In the instant case, even if grand jurors were deemed to be private individuals rather than public officials or public figures, actual malice would have to be shown because their actions or failure to act as grand jurors are a matter of public or general concern.

■ WAS THE EDITORIAL MADE WITH "ACTUAL MALICE"? Regarding this third issue, the Honorable O. Russell Olson, trial judge, explained in an excellent memorandum:

"The trial judge first must determine the presence of actual malice. He assumes the falsity of the statement, and determines from the evidence (on a pre-trial summary judgment such as this) whether it is shown with 'convincing clarity' the defendant printed the words with actual 'malice.' If this is shown, then the case is submitted to the jury for its separate determination. If, however, 'malice' is not shown to be present, then the libel action must fail even if the publication was a false publication. Wasserman v. Time, Inc. 3/3/70, 38 Law Week 1139 and 2477 [138 App. D. C. 7, 424 F. 2d 920 (1970)]."

From the indicators which the United States Supreme Court has set forth for determination of malice in cases involving public officials or public figures, it is apparent that summary judgment in this case was properly ordered. The standard for malice is extremely rigid, and that court seems to have ruled out a finding of the requisite malice in cases involving merely unthorough or even negligent reporting. Instead, to recover damages for libel, a plaintiff who is a public figure must now show either that the publisher published defamatory material knowing it to be false, or, if malice is predicated upon "reckless disregard" of the truth of the material, it must be shown that the publication was made with a high degree of awareness of its probable falsity. Mere errors in judgment cannot constitute malice. Time, Inc. v. Pape, 401 U. S. 279, 91 S. Ct. 633, 28 L. ed. 2d 45 (1971).

In the case at hand, Ringhofer made fairly extensive investigations, withheld publication until final adjournment of the grand jury, used qualifying language where he felt uncertain

478

of his material, and published a partial retraction in a subsequent issue of the newspaper. Such conduct is so far removed from the more offensive situations which have been found to be nonmalicious that any extended discussion of the matter beyond quoting from the trial court's memorandum seems unnecessary.[3]

[3] The trial court's memorandum has this to say on the evidence relative to malice:

"A review of the depositions and affidavits in this case resolves this issue in favor of the defendant newspaper. The affidavit and deposition of the writer of the editorial (Ringhofer) points out pretty clearly there was an *absence* of 'intent to cause harm through falsehood' and an *absence* of 'reckless disregard of whether it was false or not.' I observe the following from a reading of the depositions and affidavits: (especially Ringhofer):

"1. The utter secrecy of the grand jury proceedings caused him to wait with his criticism until the grand jury was no longer in session because he did not want to interfere with its functioning. In this respect, it is interesting to note the draft of proposed *Rules of Criminal Procedure* for Minnesota dated November 1, 1968, requires a transcript and opens that transcript to public scrutiny after the case is disposed of. * * *

"2. He searched in apparent good faith, but in vain for a 'report' of this grand jury; he checked the records in the office of the Clerk of District Court at the courthouse and discovered that some grand juries in earlier years, in fact, had filed a written report (p. 51). He had read in one of his journalism books entitled 'Public Affairs Reporting' some material which gave him the 'impression' that a grand jury was obligated to make a 'report of its doings' (p. 43-44) (written or oral before the court, p. 70); with respect to the inspection of the jail; he testified at the deposition 'it seems reasonable to assume that if they (meaning the grand jurors) would look into these things (meaning the jail and lockup) that they would want to report;' (p. 70) he further disclosed his state of mind as to the requirement of the report as follows:

'Well, any grand jury report, as I understand it, has to come to the Court and then be released by the judge into the court record.' (p. 71) It cannot be said to be 'malice' for him to conclude—even if erroneously (and this Court does not decide that that was an erroneous conclusion; that issue is not before this Court)—that this particular grand jury should be criticized publicly for failing to make a report either in open court or to file a written report. As a matter of law, this trial court is

Cf. Time, Inc. v. Pape, *supra* (conscious omission) ; Ocala Star-Banner Co. v. Damron, 401 U. S. 295, 91 S. Ct. 628, 28 L. ed. 2d 57 (1971) (negligent reporting).

---

convinced there can be no malice in that criticism—right or wrong; true or false.

"3. He determined they in fact had been furnished meals during the day at county expense. Framing criticism of that in terms of 'managing a couple of meals at county expense' is perhaps irritating, but not 'malice' as a matter of law. There is nothing in the record before this Court which justifies the expenditure of any county monies to feed meals to a grand juror; the law provides they are to be paid a fee plus mileage. M. S. A. 546.13 permits on court order the furnishing of food and lodging to *petit* jurors, not grand jurors. I find no explicit authority in the law permitting grand jurors to be fed at county expense—at least in the absence of a court order; there is no court order authorizing it in the grand jury record in clerk's office.

"This demonstrates the 'malice' issue both ways:

"A. On the one hand the feeding of the grand jurors at county expense was perhaps an over-sight on the part of someone connected with the grand jury; surely, the grand jurors themselves had no *intent* to finagle unlawfully any meal out of the county; they undoubtedly 'ate' in good faith and with good intentions.

"B. On the other hand, the newspaper criticism of the grand jury for eating meals at county expense was not with malice under the circumstances of this case (no court order of record; no statutory authority authorizing the expenditure).

"In fact, if the grand jury is not entitled to such meals, criticism by the newspaper in much stronger terms would appear to be non-libelous under the law (Truth is a defense).

"The recitations of Ringhofer's deposition and affidavits are not contradicted by any evidence elsewhere in the entire file nor by any inferences reasonably to the contrary. These recitations go to the 'guts' or essence of the 'malice' issue.

"This matter of inspecting the county jail, the city lock-up and other public buildings such as the county rest home is claimed by the plaintiffs to be .libelous. An examination of the record upon this summary judgment motion demonstrates, however, that the criticism by the newspaper is *not* shown to be with malice even though some of the newspaper's statements are false; the record discloses the following:

"1. The grand jurors have *no* duty to inspect the county rest home

480

It may seem unfair to hold that grand jurors are public officials or public figures in this case where they have no choice but to serve when ordered to do so and have not voluntarily assumed the status of public officials or public figures. It may be even more unfair to do so if these plaintiffs could have answered the charges but for statutory prohibitions of disclosing matters brought up before them while in session. However, state courts must follow the constitutional limitations upon libel as pronounced by the United States Supreme Court. Rose v. Koch, 278 Minn. 235, 254, 154 N. W. 2d 409, 423 (1967).[4]

---

nor do they have a duty to file a report in writing nor to make such an oral report before the court. However, the newspaper (as indicated above in page six of their memo), while in error on this point, is not shown to be malicious in its erroneous criticism.

"2.   The grand jury, however, does have a duty to inspect the county jail and city lock-up. They may or may not have a duty to make a 'report' (this court, as indicated earlier, does not have that issue explicitly before it to decide). However, the record in this case discloses the grand jury did *not* inspect the second floor of the jail nor did they report this in writing nor in open court. There is nothing in the law which *prevents* the jury from making a report to the Court; implied perhaps in their duty to inspect is a right and probably a duty to report to the court any frustration or interference in the performance of its duty to inspect the jail.

"The newspapers stated that the grand jury 'did not keep faith with Steele County residents.' Whether that statement is false or not may be open to dispute; assuming it is false, however, in view of the record before this Court (on the single matter of failure to complete inspection of the jail) criticism of its conduct in those terms is permissible criticism; no 'malice' is present as a matter of law."

[4] In Rose v. Koch, 278 Minn. 235, 254, 154 N. W. 2d 409, 423 (1967), this court capsuled quotations from the United States Supreme Court giving reasons for the limitations upon libel where public officials and public figures are involved.

"First, public officials and other public figures are subject to vigorous attack, including, under certain circumstances, defamatory and untruthful attack. Mr. Justice Brennan, writing for the majority of the court in New York Times, held that an action by a public official for libel must be considered 'against the background of a profound national

Since Rose and with the advent of Rosenbloom, the status of plaintiffs in this case is of little importance because their actions as grand jurors are a matter of public concern, and on that basis alone the constitutional limitations do apply.

Unfair as it may seem to apply these limitations, it is essential to do so to preserve open public debate on issues of public concern at every level of government.

The editorial in the instant case may have been in poor taste and was possibly written with little regard for the feelings of the jurors. It may have been "irritating," as pointed out by the court below. The utterances, however, could have been vehement,

---

commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' The First Amendment is, he wrote, an 'attempt to secure "the widest possible dissemination of information from diverse and antagonistic sources,"' recognizing that '"public men, are, as it were, public property," and "discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled."' Relevant to the instant case, the court said that constitutional protection 'does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered"'—that 'In the realm of religious faith, and in that of political belief, * * * resorts to exaggeration, to vilification * * *, and even to false statement' are simply degrees of abuses which 'must be protected if the freedoms of expression are to have the "breathing space" that they "need * * * to survive."' Mr. Justice Black, joined by Mr. Justice Douglas, disagreed only on the ground that the constitutional protection is even more unlimited and grants the citizen an 'unconditional right to say what one pleases about public affairs.' Mr. Justice Goldberg, joined by Mr. Justice Douglas, disagreed for like reason:

"'* * * The right should not depend upon a probing by the jury of the motivation of the citizen or press. * * *

*　*　*　*　*

"'* * * If individual citizens may be held liable in damages for strong words, which a jury finds false and maliciously motivated, there can be little doubt that public debate and advocacy will be constrained.'"

caustic, unpleasantly sharp, defamatory, and untruthful because it was about a matter of public concern and interest without any right of action unless published with knowledge that it was false or with a reckless disregard of whether or not it was false. Rose v. Koch, *supra*.

Those persons who are maligned by the news media without actual malice and who by reason of the constitutional limitations may not recover damages might find some solace and comfort in the thought that public opinion as to the reliability of the news media seems to reflect an awareness of the errors contained in the news. Unfortunately, the public usually paints its opinions with a broad brush and is inclined to lump the careless and inept news reporters with those having the highest standards of excellence in reporting.

From the record here presented, it seems clear that summary judgment was properly granted. Plaintiffs offer no evidence which, if true, would sustain a finding of actual malice. At most, the libels alleged show ignorance of the law and of some of the facts on the part of the editorialist. Under the New York Times formulation, ignorance or even negligence does not constitute malice; hence, there being no genuine issue of any fact material to a determination of actual malice, summary judgment under Rule 56, Rules of Civil Procedure, was justified. The judgments are affirmed.

Affirmed.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.