The TIMES–MIRROR COMPANY, The Dallas Times Herald and Times Herald-Printing Company et al., Appellants,

v.

Robert J. HARDEN, Appellee.

No. 11–81–058–CV.

Court of Appeals of Texas, Eastland.

Feb. 24, 1982.

Rehearing Denied March 18, 1982.

Jack Pew, Jr., Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellants.

Don Black, Dallas, for appellee.

RALEIGH BROWN, Justice.

This is a libel action. Robert J. Harden sued The Times Herald Printing Company, publisher of the Dallas Times Herald, and Bob Dudney and Hugh Aynesworth, co-authors of an article published in the Dallas Times Herald. Harden contended that the article dealing with his activities while he was an undercover narcotics agent with the Texas Department of Public Safety was libelous. The jury determined that the article was substantially false, was defamatory, was published with actual malice, and was not privileged under Texas statutes. Harden's actual damages were found to be $135,000 and exemplary damages of $250,000 were awarded. Judgment was rendered on the verdict authorizing Harden a recovery of $385,000. Times Herald Printing, Dudney and Aynesworth appeal. We reverse and render.

■ The parties have stipulated that Harden was a public official. Harden must, therefore, prove that the article was published with "actual malice" to recover. Appellants urge that because Harden failed to do so the trial court erred in failing to grant a judgment non obstante veredicto that Harden take nothing.

Our Supreme Court in the recent case of *Foster v. Upchurch*, 624 S.W.2d 564 (Tex. 1981), considering what a public official must establish to recover in a defamation case, said:

> For a public official to recover in a defamation suit, the plaintiff must prove "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). "Reckless disregard" requires proof that a false defamatory statement was made with a "high degree of awareness of [its] probable falsity." *Garrison*

*v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). There must be sufficient evidence to conclude that the defendant in fact entertained "serious doubts" as to the truth of the publication. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In the present case, no evidence was presented regarding Mr. Foster's state of mind or the editorial process that went into the writing and publication of the article. Upchurch simply relied upon the article itself, arguing that the internal inconsistencies therein necessarily prove a reckless disregard of its truth or falsity. We disagree.

Section 580A, comment d of the Restatement (Second) of Torts (1977), states that reckless disregard is not to be measured by a reasonably prudent person standard. See also *St. Amant*, supra, at 731, 88 S.Ct. at 1325. The *New York Times* malice standard looks to the defendant's state of mind at the time of publication. It is not enough for a plaintiff to show that the defendant made a mistake. *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). An "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'." *New York Times*, supra, 376 U.S. at 271–272, 84 S.Ct. at 721: See generally R. Sack, Libel, Slander, and Related Problems § V.5 (1980).

In *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403 (Tex.1969) the Supreme Court said:

> We think, as a matter of law, that the evidence does not show actual malice as defined in the *New York Times* case. Failure to investigate the truth or falsity of a statement before it is published has been held insufficient to show actual malice. Negligence or failure to act as a reasonably prudent man is likewise insufficient. *New York Times Co. v. Sullivan*, supra, and *St. Amant v. Thompson*, 390

U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Also see *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In the *New York Times* case, the Court held that defendant's belief that the publication was substantially correct was a reasonable belief and therefore could not constitute actual malice even if the publication were not substantially correct. In the *St. Amant* case, the Court stated:

"St. Amant's mistake about his probable legal liability does not evidence a doubtful mind on his part. That he failed to realize the import of what he broadcast—and was thus 'heedless' of the consequences for Thompson—is similarly colorless."

The Court conceded that the *New York Times* definition of actual malice " * * * puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." The Court concluded, however, that a standard which is more strict would result in self-censorship and would be contrary to the purpose of the First Amendment.

The Supreme Court in *Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex. 1970) held that the failure of the defendant's agent to check information which he had in a folder on his desk constituted "no probative evidence to raise a fact issue on the question of actual malice."

Harden contends that the evidence permits no other conclusion but that the majority of the statements made in the article were made by appellants with actual knowledge of their falsity. Harden's attorney in oral argument reaffirmed this position and conceded that his client's claim was not founded on evidence of reckless disregard of whether the statement was false or not.

Harden was employed as a DPS narcotics agent from September 1, 1970, through March 26, 1975. It was his duty to make accurate charges and give truthful testimony in narcotics cases. He became a contro-versial figure in the Texas courts. In May or June of 1975, Bob Dudney, a reporter for the Dallas Times Herald, became aware of Harden's activities and reputation. Dudney began work on the article. Hugh Aynesworth, another Times Herald reporter, assisted. Dudney testified that he did all the writing and the greater part of the research developing the facts for the article. He spent approximately one and one-half months doing so. He interviewed judges, prosecutors, defense attorneys and law enforcement officials.

Aynesworth investigated Harden's activities in the Fort Hood area, checking court records and talking with the district attorney's office there. Dudney and Aynesworth jointly interviewed Henry Wade, District Attorney of Dallas County; Harden; Col. Speir, Director of the DPS; and Jim Ray, commander of state narcotics for the DPS.

In the five years between 1975 and the trial, all of Aynesworth's notes and some of Dudney's notes were lost. Dudney had become associate editor of "U.S. News" and Aynesworth had gone to work with American Broadcasting System. The record includes Dudney's handwritten notes of the Wade interview, typed notes of interviews with Judge Kirk and with Bob Hendricks, defense counsel in the Turner case, and a tape recording of the interview with Col. Speir and Chief Ray.

The article appeared on the front page of the Dallas Times Herald on Sunday, November 9, 1975. It was headlined "Probe into ex-DPS agent's arrests yields string of questionable cases." It continued on an inside page under the headline "Testimony by ex-agent discredited by Dallas DA."

 Before a public official may recover for alleged libel he must prove actual malice by "clear and convincing" evidence. This requirement is mandated to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments to the United States Constitution. Our review of the evidence is of the entire record. *New York*

*Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Harris v. State,* 615 S.W.2d 330 (Tex.Civ.App.—Fort Worth 1981, writ ref'd n. r. e.); *In the Interest of S. R. M.,* 601 S.W.2d 766 (Tex.Civ.App.—Amarillo 1980, no writ); *In the Interest of Hare,* 599 S.W.2d 856 (Tex.Civ.App.—Texarkana 1980, no writ).

We shall consider those statements Harden contends are false and the evidence offered in connection therewith.

One such statement is as follows:

A Department of Public Safety narcotics agent filed numerous questionable drug crime cases in North Texas from 1970 until March of this year ... when he was "permitted to resign."

Although Harden testified that he resigned of his own volition and his former commanding officer testified that that was his understanding, Col. Speir testified that Harden was "permitted to resign" meaning that the agent was "not doing his duty like he should." The taped interview with Speir and Ray do not disprove the statement in the article. Both Dudney and Aynesworth testified that these high DPS officials stated during their interview that Harden had been allowed to resign.

Harden also contested the truth of the following statement:

Dist. Atty. Henry Wade, after reviewing this inquiry's findings, concluded his office should dismiss all pending cases using the ex-agent as a witness because future testimony would be discredited. (Quoting District Attorney Wade) "If they pass polygraph tests indicating his (Harden's) testimony is false we will ask him to take a polygraph test. I doubt very much that he would submit to such a test, however."

Dudney testified that the statements attributed to Henry Wade in the article were made by Wade in the interview. Dudney's notes of the interview quote Wade as saying: "DA's will reconsider cases where they have formal complaints." "It has to be a situation where no guilty pleas can't reopen in such a situation." "But I think we have to look at them." "Don't know what else to do." "Def's passing box will be considered.

But perjury difficult to prove. Needs two witnesses. Usually 2 in room."

In answering written interrogatories, Wade denied saying that he would dismiss pending cases or reopen other cases but he did state that while he did not recall precisely what he told the reporters, the fact is that Harden's testimony "has been discredited."

Another statement contested by Harden is the following:

The Times Herald inquiry into Harden's activities included more than 100 interviews with judges, prosecutors, attorneys and law officers and produced more than a dozen cases which authorities including Wade, agreed were suspect.

Although the article said that the Times Herald's inquiry into Harden's activities "produced more than a dozen cases which authorities including Wade, agreed were suspect" and Wade, when questioned about this, said he was unable to recall any cases, other sources supported the statement.

Henry Wade responding to Harden's interrogatories did testify:

7. Did you agree that more than a dozen cases brought to your attention were suspect?

ANSWER NUMBER SEVEN: As I recall, we had some hundred and fifty cases involving narcotics that we investigated involving a number of police officers.

8. If the preceding question is answered yes, please state the number of cases which you consider suspect and the names which you consider suspect and the names of the Defendants in each one.

ANSWER NUMBER EIGHT: As I recall, there was approximately a hundred and fifty cases. I do not recall the names of any of them.

The following statement was also challenged by Harden:

In one instance the Times Herald found conclusive evidence that a drug defendant could not have sold narcotics to Harden as the agent alleged in official reports of the case. Another case researched by

the Times Herald was filed by Harden in 1972 against a soldier stationed at Fort Hood in Killeen, Texas. This case yielded direct evidence that Harden's allegations against the GI were false. Harden told authorities that the soldier, Richard Chestnut, sold him LSD on two occasions. The Grand Jury returned two indictments against a man based upon Harden's reports. The indictments were quietly dismissed, however, when it was learned that military records showed Chestnut had been in the stockade 20 days before, during and 15 days after the purported drug sales.

The article was inaccurate in stating that two cases were filed against Richard Chestnut, a Fort Hood soldier, for selling LSD to Harden on two occasions. One case was filed by Harden and the other by another undercover agent, Floyd. However, the evidence in the cause at bar does show that both indictments were dismissed "because of insufficient evidence to support and sustain a conviction."

Falsehood was alleged in connection with the following statement:

Another Harden case, this one filed in Wichita Falls, convinced a District Judge that Harden has perjured himself and caused the dismissal of more than 30 other criminal indictments in which Harden was a material witness. In the second trial Judge Stanley Kirk felt Harden's account of the purported drug sale differed substantially from the agent's story in first. Kirk stopped the trial and ordered a lie detector test for Cook. The examiner concluded Cook was truthful in his denials of having sold Harden any narcotics. Kirk immediately found Cook innocent of the charges and dismissed all cases pending in his Court in which Harden was scheduled as a witness. Kirk, however, said that many sources of information he provided to the DPS never were contacted about the matter. According to court papers in Dallas County and elsewhere, Kirk also has furnished other defendants a sworn statement from him that in his opinion Harden is not a credible witness. The statement, dated 1973, states, 'Robert Harden appeared in My Court to testify and in my opinion he is not worthy of belief and his reputation for truth and veracity is bad.'

Judge Stanley J. Kirk had serious doubts as to Harden's credibility because of his testimony given on October 26, 1971. Leonard Hugh Cook had been convicted in Judge Kirk's court of selling marijuana to Harden. His conviction had been set aside because of improper jury argument and on his retrial Judge Kirk found Harden's version of the incident to be so different from his testimony at the first trial that Judge Kirk found Cook not guilty. As a result of this experience, the district attorney's office in Wichita Falls dismissed all cases pending on the docket, described by Judge Kirk as "a myriad number of them," in which Harden was the prosecuting witness.

Another alleged falsehood in the article was as follows:

Another Harden case which resulted in dismissal concerns the agent's allegations that a Hopkins County resident, William Michael Cassidy, sold him marijuana in 1972 at a Dallas location. He said that he was invited by an associate (later identified as another Harden informant) to come to his apartment and it was there he met Harden, but no drugs were sold. Cassidy eventually was allowed to undergo a lie-detector test from a Dallas County Deputy Sheriff who concluded Cassidy was telling the truth.

The evidence in the instant cause includes a dismissal order on the Cassidy case urged by the District Attorney dated October 15, 1973, signed by Judge Thomas P. Thorpe which included the following:

This defendant was administered a polygraph examination by Deputy Sweatt of the Dallas County Sheriff's Office on April 4, 1973. The results of that examination indicated that this defendant had no guilty knowledge of the offense in question.

Next, appellant contends that the article was false in reporting:

Of the suspect cases researched by The Times Herald it was learned that a number of defendants had requested lie detector tests from law enforcement agencies and passed them. Harden currently has two pending cases filed in Collin County against persons who have passed polygraph examinations concerning their claims of innocence. Turner has passed a polygraph test on the charges, with the examiner concluding he had no guilty knowledge of the alleged sale, but the test has not been allowed in evidence. Turner has requested a test from the DPS on the condition that Harden be forced to take the examination also. At this time Harden has continued to refuse. She, too, passed a lie-detector test but it was not allowed in her trial. Harden contended that allegations against him were 'routine' for any police officer.... Tests which show him to have fabricated drug sale transactions are invalid, possibly because of the examiner himself.

Dudney testified that he had interviewed and relied upon Turner's attorney, Bob Hendricks, for such information. The following was introduced from Hendrick's deposition:

Q (By Mr. Case) I'll show you what's been marked as Defendants' Exhibit 2, which purports to be a xerox copy of the article that's made the basis of plaintiff's lawsuit. And I believe you'll find on the third page, maybe in the middle column, the part of the story concerning Tommy and Donna Turner.

A What page was that?

Q The last page, I believe, about the middle column. Am I right?

A Yes, sir.

Q All right, sir. Before you talked with Mr. Dudney and the other reporter, had Tommy Turner in fact been tried on the charge that's contained in Defendants' Exhibit 1?

A Yes, sir. This is accurate in that there were two trials and both were lengthy and both were hung juries in the Tommy Ross Turner case.

Q All right, sir. Now, in your conversation or conversations with Mr. Dudney and/or the other newspaper reporter, did you or not tell them that Tommy Turner had taken a polygraph examination?

A If I'm not mistaken, they told me he had taken the test. They had knowledge that he had taken the test. And I believe Tommy Turner himself told them he had taken the test.

Q And did you or not tell them that he did or you understood that he did pass the examination?

A I have copies of the test, yes, sir.

Q And was it your opinion that he did pass the test?

A Yes, it was.

Q Mr. Hendricks, did you tell either of the newspaper reporters, to the best of your memory, that Tommy Turner had taken the polygraph examination? That will be one question, and then, depending on your answer, I'll ask you another one.

A Well, originally I did not tell them, no.

Q To the best of your memory, did either of the newspaper reporters indicate to you that they understood that he had taken one?

A Yes, they did.

Q And do you know in fact yourself that he did take a polygraph examination?

A Yes, sir, I do.

Q And did you tell the newspaper reporters, one or both of them, that Tommy Turner did in fact pass the polygraph examination?

A To the best of my memory, I did tell them that I had a copy of the test.

Q Well, the next question was, did you tell the reporters, either or both of them, that you understood that Tommy Turner has passed the examination?

A All right, to the best of my recollection, I did tell them that he did pass the test.

The article referred to two cases against Porter, one in Dallas County and one in Collin County, charged with selling heroin.

Based upon Harden's sole testimony, Porter was indicted on charges of selling several capsules of the narcotic. Shortly after the indictment, however, Porter underwent a polygraph examination from a licensed expert who concluded Porter was telling the truth when he claimed he never sold Harden any drugs. Further, another individual (identified in court as one of Harden's informants) gave Porter's attorneys a sworn statement that no such transaction occurred. A polygraph examination found Porter to have no guilty knowledge of this alleged sale, either ... and Harden's informant again gave a sworn statement that he observed no drug sale even though he had been with the agent and Porter.

The evidence at the trial of the instant cause included a jury's finding of not guilty in the Collin County case; the report of the polygraph examiner in which the conclusion was given that it was the opinion of the examiner that Porter was truthful when he answered that he had not sold heroin to Harden; and the statement of the informant in which he stated he had observed no drug sale between Porter and the agent.

The following alleged false statement was included in the article:

Ralph, released from jail last May, recently underwent a polygraph examination and was found to be truthful in his contention he never made the $10 sale. The test supports Ralph's statement that he never had met Harden until his trial more than 18 months after the agent says he bought the drug. Ralph said that he had requested a polygraph examination before his trial but that Judge John Mead and the prosecutors had refused. Ralph said he still wishes to work with local authorities in an effort to have the conviction expunged from his record and be released from a 10-year parole.

A report of a polygraph examination taken by David Lee Ralph on October 15, 1975, concluded that the charts obtained during the examination contained no criteria indicative of deception when Ralph answered that he had not sold marijuana to anyone in August, 1971, and that he had not seen Harden in person before his trial in January 1973.

The evidence in the case at bar reflects that every challenged statement was traced to an identified source. The author of the article relied on one or more persons for each statement, and some of these people were actively involved in the events which were the subject of the article. There is no evidence the authors either knew or had clear grounds to suspect that any statements might be false, nor is there any evidence to constitute "reckless disregard for the truth." As stated by the court in *New York Times Company v. Connor*, 365 F.2d 567 (11th Cir. 1966):

Although accuracy and objectivity in reporting are goals for which all responsible news media strive, the protection of the first amendment is not limited to statements whose validity are beyond question or which reflect an objective picture of the reported events. While verification of the facts remains an important reporting standard, a reporter, without a "high degree of awareness of their probable falsity," may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official.

From our review of the entire record, we are convinced that the proof adduced at trial did not rise to that standard of clear and convincing proof, which is necessary to sustain the finding of "actual malice." We hold that the publication was not libelous because there is no clear and convincing evidence that the article was published "with knowledge that it was false or with reckless disregard of whether it was false or not."

Our holding on this point of error makes it unnecessary for us to consider the other points of error.

The judgment of the trial court is reversed and judgment rendered that Harden take nothing.