David T. BRITTON, Respondent,

v.

Mary KOEP, individually and as Crow Wing County Commissioner, and Crow Wing County, petitioners, Appellants.

No. C8–90–1169.

Supreme Court of Minnesota.

May 24, 1991.

Jon P. Parrington, Jeffrey J. Linquist, Pustorino, Pederson, Tilton & Parrington, Minneapolis, for appellants.

Edwin Sisam, Perry Smith, Sisam & Associates, Minneapolis, for respondent.

## OPINION

YETKA, Justice.

This action for defamation arose as a result of statements the defendant-appel-

lant, Mary Koep, a Crow Wing County commissioner, made at a meeting of Crow Wing and Morrison County commissioners. Koep stated that an informant told her that a county probation officer had coerced female probationers for sexual favors. Plaintiff-respondent, David Britton, was one of two county probation officers. He brought suit.

The trial court heard cross motions for summary judgment on January 16, 1990, and ruled in favor of the defendants-appellants in all respects. On appeal, the court of appeals, in an unpublished opinion, affirmed the trial court's dismissal of the claims for infliction of emotional distress and for civil rights and due process violations under 42 U.S.C. § 1983 (1988). It reversed and remanded on the defamation claim, ruling that the trial court erred when it determined that the plaintiff-respondent was a public official for purposes of applying the *New York Times* defamation standard.

The supreme court granted review on January 24, 1991. We reverse the court of appeals and reinstate the trial court's order for judgment on all issues including defamation.

On November 26, 1985, the Joint Corrections Board for Crow Wing and Morrison Counties met. At that meeting, defendant-appellant, Mary Koep, a Crow Wing County commissioner, recommended that the corrections department hire a female probation officer to supervise female juveniles. There were only two probation officers in the department, both male. When pressed to explain the reasons for her proposal, Koep disclosed that an informant had told her recently that a Crow Wing County probation officer had harassed and coerced two female juvenile probationers for sexual favors.

The Crow Wing County Attorney, Stephen Rathke, appointed Sergeant Frank Ball of the Sheriff's Department to investigate the allegations. Ball suspected that the subject of the allegations was David Britton. Koep told Ball that two informants from the community had alleged the probation officer's sexual improprieties, but she had promised them that they would remain anonymous.

One of the informants, Jenny Olson, voluntarily came forward. She met with Ball on January 3, 1986. She described an incident which occurred several years earlier in which David Britton, apparently intoxicated, "fooled around with two girls" sitting on the steps outside a neighbor's house. She said that several people had told her that Britton "drinks too much and he chases around."

On January 8, 1986, the *Brainerd Daily Dispatch* published the first in a series of articles about the allegations of sexual improprieties in the corrections department. A few days later, the second of Koep's informants telephoned Ball and told him that she would like to meet with him, but she asked for anonymity. This informant said that, when she had worked at the local women's center, there had been rumors among the employees about Britton's sexual exploitation of probationers. She also reported that two teenage girls in a support group talked about "Britton and his request for sexual favors * * * and his authority to send them away if they didn't cooperate." Ball found this informant to be "very reliable and I had no reason to disbelieve" her.

Based on the informant's information, Ball next located four former employees of the women's center. Only one said that she had heard rumors Britton exploited female probationers, and none of the girls at the women's center had come forward with accusations. The other former employees stated that Britton had behaved professionally. They said that they were unaware of sexual misconduct and would have immediately reported any abuse.

Ball concluded that he was unable to substantiate the allegations of impropriety. The county attorney convened a grand jury to consider the matter. The grand jury found no grounds for indictment or for continuing the investigation.

Britton resigned his position on March 14, 1986. He described his resignation as "forced" because he felt that he could no

longer function in the job because of his public humiliation. This lawsuit ensued.

The issues in this appeal are:

I. Is David Britton a public official for purposes of applying the *New York Times* defamation standard?

II. Did the trial court correctly grant summary judgment to defendants-appellants on the defamation claim?

The elements of a cause of action for defamation include a false and defamatory statement about the plaintiff; an unprivileged publication to a third party; a tendency to harm the plaintiff's reputation in the community; and fault, at least negligence. Restatement (Second) of Torts § 558 (1977); *see, e.g., Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 886 (Minn.1986). This case concerns the standard to be applied in determining fault. If this court determines that Britton, in his capacity as a county probation officer, is a public official rather than a private individual, the standard of fault the plaintiff must prove is higher.

■ The public or private status of the plaintiff in a defamation action is a question of law. *Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 483 (Minn. 1985). This court, therefore, is not bound by the determinations of the courts below.

Whether a plaintiff's status is public or private is significant because of a landmark case, *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The *New York Times* printed an advertisement signed by the Committee to Defend Martin Luther King and the Struggle for Freedom in the South. The advertisement criticized the use of police power to suppress nonviolent demonstrations by black students in several southern cities, including Montgomery, Alabama. L.B. Sullivan, a city commissioner of Montgomery whose duties included supervision of police, brought a libel action.

In *New York Times*, the Supreme Court applied a constitutional test under the first amendment to the common law torts of libel and slander. The Supreme Court recognized that public policy supports a "pro-found national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270, 84 S.Ct. at 721. The Court imposed a constitutionally protected privilege in order to encourage open debate. *Id.* at 279, 84 S.Ct. at 725. A public official, therefore, cannot recover damages for publications of false and defamatory content which relate to his or her official conduct *unless* he or she proves that the statement was made with "actual malice." *Id.* "Actual malice" means knowledge that the statement was false or was made with reckless disregard of whether it was true or false. *Id.* at 279–80, 84 S.Ct. at 725–26. The plaintiff has the burden of proving actual malice with "convincing clarity." *Id.* at 285–86, 84 S.Ct. at 728–29.

Under the *New York Times* rule, if Britton is a public official, the defendants are liable for damages for criticizing his conduct in his official position only if he proves that Koep spoke with actual malice. If, on the other hand, Britton is a private individual, then he may recover damages by showing that Koep was merely negligent when she made false statements about his behavior. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

Even before *New York Times v. Sullivan*, the common law recognized a qualified privilege of "fair comment" on the conduct and qualifications of public officers and public employees. *See generally* Prosser, *Law of Torts* § 118 (4th ed. 1971) and cases cited therein. Minnesota was in the forefront for protection of public debate. Fair comment on the conduct of public officials was privileged, *see, e.g., Clancy v. Daily News Corp.*, 202 Minn. 1, 8, 277 N.W. 264, 268 (1938), as was fair and impartial reporting of official proceedings and statements on matters in the public interest. *E.g., Nixon v. Dispatch Printing Co.*, 101 Minn. 309, 112 N.W. 258 (1907); *Burch v. Bernard*, 107 Minn. 210, 211–12, 120 N.W. 33, 34 (1909). *See generally* Note, *Minnesota Defamation Law and the Con-*

*stitution: First Amendment Limitations on the Common Law Torts of Libel and Slander,* 3 Wm. Mitchell L.Rev. 81, 88 (1977). This court explained that debate about the conduct of public officials is privileged "not for the protection of the defendant, but rather in the interests of the promotion of public welfare." *Hammersten v. Reiling,* 262 Minn. 200, 207, 115 N.W.2d 259, 264, *cert. denied,* 371 U.S. 862, 83 S.Ct. 120, 9 L.Ed.2d 100 (1962). The Supreme Court, in *New York Times,* recognized Minnesota as a state that followed a rule similar to the *New York Times* rule and cited *Friedell v. Blakely Printing Co.,* 163 Minn. 226, 230, 203 N.W. 974, 975 (1925). 376 U.S. at 280, n. 20, 84 S.Ct. at 726, n. 20.

■ Minnesota affords to nonmedia defendants the same first amendment protection for criticism of public officials that it grants to the mass media. *See, e.g., Hirman v. Rogers,* 257 N.W.2d 563 (Minn. 1977); *Beatty v. Ellings,* 285 Minn. 293, 173 N.W.2d 12 (1969), *cert. denied,* 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63 (1970); *Culliton v. Mize,* 403 N.W.2d 853, 856 (Minn.App.1987); *Valento v. Ulrich,* 402 N.W.2d 809 (Minn.App.1987).

■ Since the *New York Times* case, the Minnesota Supreme Court has decided several ·claims of defamation of public officials: *Diesen v. Hessburg,* 455 N.W.2d 446 (Minn.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1072, 112 L.Ed.2d 1177 (1991); *Hirman v. Rogers,* 257 N.W.2d 563 (Minn. 1977); *Standke v. D.E. Darby & Sons, Inc.,* 291 Minn. 468, 193 N.W.2d 139 (1971); and *Mahnke v. Northwest Publications, Inc.,* 280 Minn. 328, 160 N.W.2d 1 (1968).[1] In *Diesen v. Hessburg,* the parties did not contest the public status of the plaintiff, a county attorney. Similarly, in *Mahnke,* where the plaintiff was a police officer, his status as a public official for purposes of the *New York Times* rule was not at issue.

*See* 280 Minn. at 349–51, 160 N.W.2d at 14–15 (approving jury instructions). The plaintiffs in *Hirman v. Rogers* were a deputy sheriff and two police officers. The parties and the trial court agreed that they were public officials. 257 N.W.2d at 566. This court, in that case, defined "public officials": "Where plaintiffs in a defamation action perform governmental duties, directly related to the public interest, they are public officials and, as such, fall squarely within the 'actual malice' requirement set forth in *New York Times v. Sullivan.*" *Id.* (citation omitted).

Finally, in *Standke,* this court defined "public official" most broadly so as to include grand jurors. In *Standke,* a newspaper editor wrote an editorial critical of the grand jury for its failure to investigate or report on subjects of local controversy. 291 Minn. at 470, 193 N.W.2d at 141. The jurors commenced libel actions. The supreme court concluded that the jurors were either public officials or public figures because they performed governmental duties, including power to indict and investigate. *Id.* at 473–74, 193 N.W.2d at 143. The court based its conclusion on the public interest in grand jury functions and on the "interests of free and open discussion." *Id.* at 471, 193 N.W.2d at 142.

We indicated in *Standke* our intention to follow the general approach set forth in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), which broadened the *New York Times* concept of public official to include a former supervisor of a county recreation area. The United States Supreme Court reiterated in *Rosenblatt* that it did not intend "to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." *Id.* 383 U.S. at 85, 86 S.Ct. at 675, quoting *New*

---

1. Both parties to the case at bar cite *Jadwin v. Minneapolis Star & Tribune Co.,* 367 N.W.2d 476 (Minn.1985), but that case considered whether the individual and corporate plaintiffs were public *figures,* not whether they were public *officials.* A person becomes a public figure not by her government employment, but by voluntarily entering a public controversy. *Curtis Publishing Co. v. Butts and Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The same standard—actual malice—applies in public figure defamation cases, but *Jadwin* is not helpful in defining what constitutes a public official.

*York Times v. Sullivan,* 376 U.S. 254, 283 n. 23, 84 S.Ct. 710, 727 n. 23, 11 L.Ed.2d 686.

The *Standke* court relied on two public policy considerations set forth in *Rosenblatt:* the strong interest in debate about public issues and the strong interest in debate about the people who hold positions such that they can significantly influence the resolution of those public issues. *Standke,* 291 Minn. at 473, 193 N.W.2d at 143. The court stated that the "'public official' designation applies *at the very least* to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* (emphasis in original) (quoting *Rosenblatt,* 383 U.S. at 85, 86 S.Ct. at 675).

Turning to the case at bar, this court has three criteria to use in evaluating whether a county probation officer is a public official for the purposes of the *New York Times* rule: performing governmental duties directly related to the public interest (*Hirman*); holding a position to influence significantly the resolution of public issues (*Standke*); and government employees having, or appearing to the public to have, substantial responsibility for or control over the conduct of government affairs (*Standke*). The *Hirman* criterion is very broad and could be applied to any government functionary. The *Standke* criteria are narrower; they require the government employee to have some "influence," "responsibility," or "control."

In order to determine the power and authority of a county probation officer, this court may examine the duties delineated by statute. Minnesota Statutes § 260.311, subdivision 3 (1990) describes the powers and duties of probation officers. "[I]n the performance of their duties [they] shall have the general powers of a peace officer," including making investigations; furnishing information to the court; taking charge of persons before, during, or after trial; and keeping records and making reports to the court. They also provide "probation and parole services," initiate programs to prevent delinquency and crime, and rehabilitate persons. Minn.Stat. § 260.311, subd. 3. The statutes also grant authority to "any peace officer or parole or probation officer" to retake and detain any child who escapes from field supervision or confinement. Minn.Stat. § 242.19, subd. 3 (1990). The probation officer has supervisory power over juveniles under Minn.Stat. § 242.22 (1990).

In addition, a probation officer has the power of arrest. Minnesota Statutes § 260.165, subdivision 1(d) provides that a peace officer or probation or parole officer may take a child into immediate custody when the child has violated the terms of probation, parole, or other field supervision. A court may transfer legal custody of a delinquent child to a county probation officer for placement. Minn.Stat. § 260.185, subd. 1(c)(5) (1990). Probation officers have the authority, "without order or warrant," to take and detain a probationer. Minn.Stat. § 401.02, subd. 4 (1990).

It thus appears from the statutes that a probation officer has significant governmental authority over the juveniles he or she supervises. The statutes themselves compare the authority to that of a peace officer.

This jurisdiction and others have consistently determined that law enforcement officers are public officials. In *Hirman,* a deputy sheriff and two city police officers were public officials for the purposes of the *New York Times* rule. Apparently the court did not consider the fact relevant that the plaintiffs were in lower echelon positions; one was merely a dispatcher. In *Mahnke,* we determined that a police detective was also a public official.

The following cases from other jurisdictions have addressed the issue and concluded that law enforcement officers at various levels are public officials for purposes of the *New York Times* rule:
*Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (police detective was public official);
*Ethridge v. North Mississippi Communications, Inc.,* 460 F.Supp. 347 (N.D.Miss. 1978) (applying Mississippi law) (city police

officer was public official even though he worked undercover and was not widely known);

*Smith v. Russell,* 456 So.2d 462 (Fla.1984), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985) (police officer was public official);

*Romero v. Abbeville Broadcasting Serv., Inc.,* 420 So.2d 1247 (La.Ct.App.1982) (deputy sheriff was public official);

*Newson v. Henry,* 443 So.2d 817 (Miss. 1983) (retired sheriff retained public official status for purposes of statements about his or her public life);

*NAACP v. Moody,* 350 So.2d 1365, 1369 (Miss.1977) (state highway patrolman was public official "with substantial responsibility in the conduct of governmental affairs");

*Orr v. Lynch,* 60 A.D.2d 949, 401 N.Y.S.2d 897, *aff'd,* 45 N.Y.2d 903, 411 N.Y.S.2d 10, 383 N.E.2d 562 (1978) (police officer was public official);

*Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super. 475, 448 A.2d 6 (1982) (police officer was public official); *see also Rutt v. Bethlehems' Globe Publishing Co.,* 335 Pa. Super. 163, 484 A.2d 72 (1984) (police officer was not public official with respect to private matters);

*Shipley v. Knoxville Journal Corp.,* 670 S.W.2d 222 (Tenn.Ct.App.1984) (city safety director was public official);

*Times–Mirror Co. v. Harden,* 628 S.W.2d 859 (Tex.Ct.App.1982) (undercover narcotics agent was public official);

*Times Herald Printing Co. v. Bessent,* 601 S.W.2d 487 (Tex.Ct.App.1980) (narcotics officer was public official).

The Supreme Court of New Hampshire also dealt with the issue, but under New Hampshire law, whether a person is a public official is a question of fact for the jury rather than a question of law as it is in other jurisdictions. *See McCusker v. Valley News,* 121 N.H. 258, 428 A.2d 493, *cert.*

*denied,* 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981) (deputy sheriff).

To summarize the case law of other jurisdictions, other courts unanimously have held that police officers, undercover agents, and deputy sheriffs are public officials. The rationale appears to be that, even for those who work undercover or anonymously, *see, e.g., Times–Mirror Co. v. Harden,* 628 S.W.2d 859 (Tenn.Ct.App. 1984), those officers possess significant powers granted by the government.

Functionally, the most relevant inquiry is not into a government employee's visibility, prestige, or even power to set policy; rather, it is whether that employee is able to assert the authority of government while performing his duties. For example, in finding that a junior social worker who removed children from their parents' home was a public official, the Tennessee Supreme Court reasoned that public official status

does not necessarily apply only to high public position. Any position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family, is a public office within the meaning of the constitutional privilege.

*Press, Inc. v. Verran,* 569 S.W.2d 435, 441 (Tenn.1978).

The authority granted by statute to a probation officer is similar in many respects to that of other peace officers—power to arrest, detain, investigate, report, and take custody of juveniles. While this probation officer's performance of government functions is limited to authority over juveniles, it is no less imposing to that segment of the population. The same opportunity to exploit the probation officer's official position exists within that juvenile community as for other peace officers within the general population.[2]

In conclusion, a probation officer has significant authority in the performance of

---

[2]. Sergeant Ball's investigation could not substantiate the allegations of harassment of probationers. His report, however, reveals the potential for a probation officer to exploit his governmental authority.

government duties. He is a peace officer with law enforcement power, including that of arrest. We, therefore, hold that he is a public official. Because Britton is a public official, it is unnecessary to decide whether he is a public figure or whether an important public issue is involved. We need not apply public-figure analysis or determine whether debate on important public issues is constitutionally privileged in order to decide this case.

Summary judgment is appropriate where the pleadings, depositions, interrogatories, and affidavits show that there is no genuine issue as to any material fact and one party is entitled to judgment as a matter of law. Minn.R.Civ.P. 56.03.

■ The public or private status of the plaintiff in a defamation action is a question of law. *Jadwin*, 367 N.W.2d at 483. Because this court has determined that Britton is a public official, in order to prevail, he must prove with "convincing clarity" that Koep made the defamatory statements with actual malice. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. "Actual malice" means with knowledge that the statements were false or with reckless disregard of whether they were true or false. *Id.*

The standard of "reckless disregard" is a subjective one. *Diesen*, 455 N.W.2d at 464 (citing *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989)). The Supreme Court defined "reckless conduct":

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

The question of whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. *Diesen v. Hessburg*, 455 N.W.2d 446, 464 (Minn.1990) (citing *Harte–Hanks*, 491 U.S. at 685, 109 S.Ct. at 2694). In the case at bar, the record reveals no evidence that Koep entertained serious doubts as to the truth of her statements. In her deposition, Koep stated that an informant had told her that a county probation officer had harassed or coerced probationers for sexual favors. Sergeant Ball stated in his report that one of Koep's informants was "very reliable and I had no reason to disbelieve" her. There is no evidence to suggest that Koep did not also find the informant believable. Although Koep did not seek to corroborate the information from the two informants, failure to investigate does not establish bad faith. *St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326. Finally, Sergeant Ball and County Attorney Rathke stated in their affidavits that, during the course of their dealings with Koep, she never indicated that she entertained doubts about the allegations against Britton.

This court stated in *Diesen v. Hessburg* that "the reviewing court must 'examine for [itself] the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment * * * protect.'" 455 N.W.2d 446, 453 (1990). Here, Koep made the statements at a meeting of county commissioners whose responsibility was to supervise the corrections department. The remarks criticized the behavior of one of the corrections officials in the conduct of his job. The circumstances suggest that Koep made the statements in good faith.

There is certainly no evidence to indicate malice. It is difficult to imagine how Koep could have responded otherwise when she was pressed to disclose her reason for wanting to hire a female agent. After all, she was an elected official with a duty to the citizens. She had information essential to making an intelligent, informed decision. We find it difficult to conceive even a question of ordinary negligence, let alone malice, to submit to a jury.

We thus reverse the court of appeals on the defamation issue and reinstate the trial court's summary judgment in favor of defendants-appellants in all respects.