**A.H. BELO CORPORATION, and Earl Golz, Appellants,**

v.

**J. Newton RAYZOR, Appellee.**

**No. 2–82–008–CV.**

Court of Appeals of Texas,
Fort Worth.

Nov. 4, 1982.

Rehearing Denied Dec. 30, 1982.

Locke, Purnell, Boren, Laney & Neely and John H. McElhaney, Stephen Philbin, Dallas, Jackson & Levy, Denton, McGinnis, Lochridge & Kilgore, Austin, Brown, Herman, Scott, Dean & Miles, Fort Worth, for appellants.

Bracewell & Patterson, and Carol Vance, Richard A. Gumpert, Houston, Gray, Whitten & Loveless, Denton, for appellee.

Before HUGHES, JORDAN and RICHARD L. BROWN, JJ.

## OPINION

JORDAN, Justice.

See also *A.H. Belo Corp. v. Rayzor*, 620 S.W.2d 756 (Tex.Civ.App.—Fort Worth 1981, writ dism'd) (on plea of privilege).

Appellee Rayzor sued appellants, A.H. Belo Corporation, publisher of the Dallas Morning News and Earl Golz, an investigative reporter for the News, for libel as a result of two articles written by Golz and published by the News on August 17, 1979 and December 8, 1979. Trial in a Denton County trial court resulted in a verdict for appellee for $1,000,000 actual damages against both appellants and for $1,000,000 exemplary damages against the A.H. Belo Corporation. Both Belo Corporation and Golz appeal on thirty-two points of error. After considering all points of error necessary to this decision, we reverse and render judgment that appellee take nothing as against either appellant herein.

The articles made the basis for this libel suit involved the reporting of an early morning telephone call on July 22, 1979 from appellee J. Newton Rayzor to one Hermas Miller, at that time a Vice President of North Texas State University in Denton, Texas. A brief factual review of events preceding that early morning telephone call is necessary to understand what precipitated it and what it involved.

Early in 1979 there were reports of fiscal wrongdoing or irregularities at North Texas State University (NTSU), and both the State Auditor's office and the General Investigating Committee of the Texas House of Representatives began an investigation into these alleged wrongful activities. This investigation, which lasted for several months, revealed different problems that existed at the University and with the North Texas State Educational Foundation, which was a private organization established to assist NTSU financially and otherwise. The investigation led, either directly or indirectly, to the resignation of the President of the University, C.C. "Jitter" Nolen, but did not result in any criminal indictments against anyone involved, either at the University or with the Educational Foundation. Appellee Rayzor was at the time a member of the Board of Trustees of the Educational Foundation and was at one time chairman of that board. Rayzor had long been interested in, and was a benefactor of NTSU, having donated land and other things of value to that University.

When the various investigations into the affairs of NTSU and the Educational Foundation began, appellee became very much concerned and perturbed, particularly about the forced resignation of his good and longtime friend, C.C. "Jitter" Nolen, as president. Appellee testified that "things began happening at NTSU that concerned him" and "it was getting worse and worse," and that the school got some bad publicity. He said that after "Jitter" Nolen resigned things really got worse; morale was low and there was a "climate of fear."

After Nolen resigned as president of NTSU, John Carter became acting presi-

dent. Hermas Miller, while not a party to this appeal, was Vice President of NTSU for administrative affairs, and was a party to the lawsuit for libel filed by Appellee Rayzor because Miller was the one who reported to Earl Golz the receipt of an abusive and disturbing phone call at 5:15 a.m., July 22, 1979 from Rayzor. Golz was an investigative reporter for the News and one of the appellants herein. The jury, however, found that although Miller's statement to Golz was slanderous as to Rayzor, it was not the proximate cause of any damage to Rayzor. The jury also refused to find that Miller acted with malice.

Earl Golz had been a newspaper reporter for twenty-four years, and an investigative reporter for ten of those years, when the investigations into the affairs of NTSU and the Educational Foundation began in the spring of 1979. He spent a lot of his working time investigating and examining the various controversies surrounding NTSU and the Educational Foundation and reporting on them for the Dallas Morning News. Between April 6, 1979 and November 26, 1980, there appeared in the News many articles about NTSU and Foundation affairs, as well as articles concerning various individuals connected with the University and the Educational Foundation. Golz wrote most, if not all, of these articles.

On July 20, 1979, three of Rayzor's closest friends on the NTSU faculty, Roy Busby, Jane Smith and Miles Anderson, all Vice Presidents of different departments and closely allied with Nolen, were fired by acting President and Vice President for fiscal affairs, John Carter. Rayzor learned of these firings the next day and was "very upset" and in fact outraged because of them. The next night, Saturday, July 21, 1979, Rayzor and his wife had dinner with Jim Reid, who had been Director of Development under former President Nolen and his wife, in Denton. They returned to their home in Fort Worth about 1:00 or 1:30 a.m., on Sunday morning, July 22, 1979.

Appellee then began what can only be described as a most unusual and rather bizarre course of conduct, making some six or seven telephone calls between the hours of 1:30 and 5:30 to different people involved with the University and the investigations into its affairs. It is necessary to discuss most of these phone calls on that particular early morning to reveal appellee's grave concern with, and his involvement in, the affairs of NTSU, and also to indicate that Rayzor, for the purposes of this lawsuit, was a "vortex public figure", as defined by the United States Supreme Court, because he had voluntarily injected himself into the public controversy surrounding NTSU.

Shortly after returning to his Fort Worth home in the early morning of July 22, 1979, he called Jim Reid in Denton and recommended that he and the others formerly associated with former President "Jitter" Nolen hire Carol Vance, a Houston attorney, and attorney of record in this case, to represent and assist them. About 2:15 a.m., he called Andy Everest, Athletic Director at NTSU, who told him: "[t]he Gestapo is running the school now," and that the firings of the three vice presidents were ordered after the Board of Regents of NTSU had adjourned their meeting. He then, at 3:21 a.m., called John Carter, acting President of the University, and told him to keep all the files intact and that he, Rayzor, was going to get some legal help for the people who had been fired by Carter. At 4:01 a.m., he called Roy Appleton, editor of the Denton Record Chronicle, a friend, and discussed the firings and the general situation.

At 5:13 a.m. on the morning of July 22, 1979, he called Hermas Miller, Vice President for Administrative Affairs, and this was the call that resulted in this libel suit being filed by appellant. He called Miller, Rayzor said, because Miller had a lot of the files and he told Miller he wanted them kept intact. Rayzor said he told Miller "the worm has turned," and that that was all he told Miller. He did admit that Miller could have interpreted his words that "the worm has turned" as a threat to Miller's job, although he said he didn't mean it that way. According to Miller, who made notes immediately after the call and who also immediately reported the call to the Denton

police, Rayzor told him: "Humas, this is Newton Rayzor. I'm going to get your ass. The worm has turned and I'm going to hire somebody to get you." Rayzor denied saying this to Miller.

Appellee then, at 5:28 a.m., called Carlton Wilde, an attorney with the Bracewell and Patterson law firm of Houston. Carol Vance, attorney of record in this case, was then planning to join this law firm, as he later did.

Sometime after July 22, 1979, Rayzor called a meeting, at which Roy Busby, Miles Anderson, Jane Smith, Jim Reid, C.J. Taylor, student attorney, and Mike Whitten, another attorney of record in this case, were present. This meeting was for the purpose of discussing how to counter the adverse publicity that had attended the investigations into the fiscal matters of the University and the Foundation.

A few days after the phone call from Rayzor, Miller reported Rayzor's phone call to Billy Clayton, Speaker of the Texas House of Representatives, and as a result of this call an investigation into both the calls to John Carter and to Hermas Miller was conducted by the Texas Rangers. Hermas Miller had previously been involved in State Government, holding different jobs over the years preceding his employment at NTSU, and because of this was well acquainted with many State officials in Austin.

The investigation into these calls was made by Sergeant Moore of Company "B" of the Rangers, out of Garland, Texas. Moore talked to Carter, Miller, and Rayzor. No charges of any kind were filed.

In mid-August, 1979, Earl Golz, Dallas News reporter, learned of this investigation by the Texas Ranger and of Billy Clayton's involvement, and this, apparently, rekindled his interest in the NTSU matter. On August 17, 1979, after talking to Hermas Miller, John Carter and Newton Rayzor, Golz wrote and the News published, the first of the two articles about Rayzor's involvement in this controversy, his calls to John Carter and Hermas Miller in the early morning, calls of July 22, 1979 and the entry into the NTSU matter of Speaker Clayton and the

Texas Rangers. Golz quoted Rayzor as having told Miller: "I'm going to get your ass. The worm has turned and I'm going to hire somebody to get you." That is the only quote attributed to Rayzor.

On December 8, 1979, the News published the second article by Golz in which he again quoted Rayzor's remarks to Miller on the phone at 5:13 a.m. on July 22, 1979. This article, according to its lead paragraph, was apparently triggered by the purported firing just prior to this date of Hermas Miller by Dr. Frank Vandiver, the new acting President of NTSU. Dr. Vandiver apparently attempted to fire Miller before he was actually officially named President by the Board of Regents.

These two articles, which are the basis of appellee's libel suit against appellants, will be referred to throughout this opinion and both are attached hereto verbatim as an appendix to the opinion.

The libel suit followed on December 17, 1979, with appellee alleging that the News had published the defamatory "quotes" without using "ordinary and proper journalistic care" and with "a reckless disregard for the truth." He sought a total of $4,000,000 in actual and punitive damages. The jury, at the conclusion of the trial, in answers to special issues, returned a verdict against the News and Golz for $1,000,000 actual damages and against the News only for $1,000,000 exemplary damages.

In this case this court is confronted with the ancient and ongoing conflict between freedom of speech and freedom of the press as guaranteed by the First Amendment to the United States Constitution and art. I, sec. 8 of the Texas Constitution and the sacred right of the individual to protect his good name and reputation from the publication by any individual or any publication of false, defamatory, or libelous statements. Perhaps no individual right is more important than this one. There are many who consider it more valuable than gold or silver and some who consider this right more important even than life itself. On the other hand, it is unnecessary in this opinion to

quote from the plethora of sources which stress the admitted and necessary right and value of freedom of the press and of free speech. Without this, there would be no democracy. The absolute necessity of reporting of public events and the reporting of news concerning public officials and public figures, as well as any items of general news interest to the public, cannot be doubted or disputed.

Perhaps there is no better description of the almost sacred respect given to freedom of the press than that of the first Chief Justice of the United States Supreme Court, John Marshall, in his answer to Talleyrand's complaints about American newspapers, contained in American State Papers, 2 Foreign Relations 196 (U.S.Cong. 1832):

"Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.*" (Emphasis the author's).

Chief Justice Marshall's words are as true and vibrant today as they were when uttered, although this is not to say that freedom of the press has not been often abused from Marshall's time to the present, and on many occasions, even lacerated and torn to shreds. As Marshall said, this liberty is often carried to excess, but from the earliest days of our history, this free society,

and the Supreme Court, has tolerated some abuse. This is not to say, either, that news writers and editors, of whatever description, should not constantly use more self-restraint and self-censorship than many of them often do.

Appellant's first point of error contends that the trial court erred in overruling their motions for judgment on the verdict and, alternatively, for judgment non obstante veredicto, for the reasons that the jury found in answer to special issues one and two that the only possible defamatory fact in the articles about which Rayzor complained was made by Miller to Golz and was not false. Appellant's next three points of error maintain that there is no evidence, or legally insufficient evidence, to establish that either of the published articles contained any false, defamatory fact, that either of the articles was substantially or materially false, or that either of the articles could have caused the ordinary reader to believe that Rayzor had threatened Miller's life or physical well-being and had committed a crime.

We agree with and sustain appellant's first four points of error.

Special Issue No. 1 in the court's charge inquired of the jury: "Do you find from a preponderance of the evidence that Hermas Miller, on or about August 16, 1979, made the statement to Earl Golz that Newton Rayzor had said to him, 'I am going to get your ass. The worm has turned and I am going to hire someone to get you,' or words to that effect." The jury answered, "We Do" to this issue. Special Issue No. 2, conditioned on an affirmative answer to Issue No. 1, asked the jury: "Do you find from a preponderance of the evidence that such statement was false?", to which the jury replied, "We do not."

Thus, the jury actually found that the only allegedly false factual statement attributed to the two News articles regarding Rayzor's remarks to Miller at 5:13 a.m. on July 22, 1979 was not false. We agree with appellant's insistence that Rayzor's failure to prove that the articles contained any false, defamatory fact requires rendition of

judgment for the News and Golz. The jury's findings were that Miller's statement of what Rayzor said was not false, which means to us that the News, in publishing the statement, was simply publishing words out of Rayzor's own mouth. While Rayzor denied uttering these identical words, a reading of this entire record makes it plain that there was no real doubt that he did in fact tell Miller exactly what Miller reported to Golz. Rayzor was frustrated and furious with the developments at NTSU, the university in which he had great interest, and he thought C.C. "Jitter" Nolen and some of his other friends had been mistreated. He also thought that Hermas Miller was one of the ones responsible for that situation. Hence, in an all night phone orgy at most unusual hours for making telephone calls, he called Miller and made the statements attributed to him, as the jury found.

The jury's findings render the News' accurate quotation of Rayzor protected, just as if Rayzor had made the statement directly to the News, and if, as the jury found in answer to later special issues, a reader believed that his statement implied some kind of physical threat to Miller's life or well-being, or his job, that implication came, not from Miller or the News, but from Rayzor's own words.

Because of these jury findings, as well as for other reasons to be discussed, the trial court erred in rendering judgment for Rayzor.

The jury's findings to Special Issues Nos. 1 and 2 that Miller accurately quoted Rayzor to Golz, and that such statement was not false is supported by more than sufficient evidence. In fact, it is our opinion that a contrary finding of the jury would not have been supported by legally sufficient or probative evidence. We think the overwhelming weight of the evidence, viewing this record as a whole, is to the effect that neither of the two News articles contained any false or defamatory statements about Rayzor. Rayzor simply wholly failed to prove, as he must have, that either of the articles contained any false, defamatory fact about Rayzor. Both articles referred to the Texas Ranger's investigations into "alleged threats" made by Rayzor during his early morning phone calls to Carter and Miller. The August 17, 1979 article correctly quoted Rayzor as denying threatening the two NTSU officials and quoted him as saying: "Hell no, I didn't threaten them. I passed information on to them." When asked what information he gave to the two officials, Rayzor said, "Why don't you ask them?" This article in several places referred to "alleged threats."

While, as stated, the articles of August 17 and December 8, 1979 are attached hereto as an appendix, we will briefly review those articles to show that in our opinion there was nothing false and defamatory or slanderous in them. The August 17, 1979 article said in its first paragraph that a Texas Ranger quizzed a trustee of the North Texas State University Educational Foundation Thursday about early morning telephone calls in which he *allegedly threatened* two NTSU officers who were cooperating with state investigators looking into fiscal irregularities at the Denton school. It then quoted Rayzor as saying he had not threatened the two school officials but had merely passed information on to them. It said that Carter and Miller were called the morning after Carter (acting President) fired three NTSU vice presidents, after the Board of Regents had met in executive session to discuss the investigation by the House General Investigating Committee report that state auditors had found illegal diversion of state funds and donor's gifts involving the university's private educational foundation. The report advised that the Texas Ranger, Moore, investigating the situation did not consider them actual threats and that Carter did not want to pursue a complaint against Rayzor.

The August 17 article went on to state Rayzor told Carter in the early morning phone conversation that they were going to get a group to look into the NTSU firings, investigate the situation, and hire an outside law firm. The story then quoted Rayzor's words to Miller which have been quoted above, made in the 5:13 a.m., July 22,

1979 phone call to Miller. It described Rayzor as a wealthy booster of NTSU who had worked closely with Nolen and was a good friend of Roy K. Busby, one of the vice presidents fired by Carter. The News article then quoted Jerry Cobb, District Attorney of Denton County, as saying he was not going to take an active part in seeking indictments, and would make a decision after indictments were returned, if they were, as to whether he would participate in the prosecution of them.

The News item concluded by saying that special state audits showed university and foundation funds were co-mingled and in some instances, were spent for items that the university is prohibited by law from purchasing. It said auditors found the foundation books in such disarray that exact measures of the transaction were impossible.

■ We hold as a matter of law that all of the information and statements contained in both these articles were either factually true or constituted fair and privileged editorial comment on the general situation existing at NTSU and the phone calls from Rayzor to Carter and Miller.

The December 8, 1979 article dealt mainly with the attempted naming of Frank E. Vandiver as President of NTSU, and the fact that Vandiver tried to fire Hermas Miller before he, Vandiver, was officially named President by the Board of Regents, all of which was true. It said one of Vandiver's first acts after being named president was to fire Miller, a leading critic of the Nolen administration. It then reported that the selection of Vandiver was handled almost solely by Governor Clements' two newly appointed regents, Winfree Brown of Midland and Eddie Chiles of Fort Worth, and discussed the report that Brown and Chiles had lured Vandiver to the NTSU job by promising him private funds to supplement his state salary, which was $43,900.

The article then reported that Miller's firing appeared certain to light a political powder keg in Austin, and it quoted Speaker Billy Clayton's comments on the situation. It then went on to state that Vandi-

ver, the new President had offered to help Miller get another job, telling him he was competent and had done an outstanding job. The article quoted Miller as saying he thought a factor in his being fired was the long-standing friendship between Vandiver and the wealthy Houston family of NTSU booster J. Newton Rayzor. The News story then again quoted Miller's description of Rayzor's 5:13 a.m., July 22, 1979 call to him in which Rayzor had said: "I'm going to get your ass. The worm has turned, and I'm going to hire somebody to get you." The December 8 article then concluded by repeating that the phone calls to Carter and Miller had been investigated by Texas Ranger Charles Moore, who said neither Carter nor Miller wanted to file a complaint against Rayzor.

■ We emphasize that Rayzor failed to prove and obtain a jury finding that the News published a false statement of fact rather than an opinion, an interpretation or a protected comment. Both the First Amendment to the United States Constitution and Texas law required Rayzor to establish that the News published a false, defamatory statement of fact rather than an opinion as an essential element of his cause of action for libel. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the United States Supreme Court, in delineating the fundamental distinction between defamatory, actional statements of fact which can be proved true or false and nonactionable opinions wrote: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 the Supreme Court said, "The *sine qua non* of recovery for defamation ... is the existence of falsehood." The First Amendment protects all but false statements of fact and mandates that all other categories of speech are free from post hoc challenges in libel actions.

See Restatement (Second) of the Law of Torts (1977) ("Second Restatement") sec. 566, Comment (libel plaintiff must prove that "defendant published a defamatory statement of fact about him that was false...").

■ The falsity requirement was also enunciated in *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 811, 819–20 (Tex.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977), in this manner: "We hold that a private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false. *In addition, the liability of a publisher or broadcaster of a defamatory falsehood about a private individual may not be predicated upon 'a factual misstatement whose content [would] not warn a reasonably prudent editor or broadcaster of its defamatory potential.'*" (Emphasis added). *Gertz v. Welch, supra.* The burden of proving falsity rested squarely on Rayzor's shoulders. *Roegelein Provision Co. v. Mayen*, 566 S.W.2d 1 (Tex.1978); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943 (N.Y.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). Rayzor was required to prove that the articles contained false, defamatory facts rather than opinions or characterizations. This is equally true when, as here, the characterization is contained in an article which accurately sets forth the characterization's factual basis.

The United States Supreme Court recognized the constitutional protection of a citizen's characterizations in *Letter Carriers v. Austin, supra,* when it held that it was not actionable for the defendant union to publish the names of non-union employees on a "List of Scabs" and to define a "scab" as a man who "sells his ... country, his wife, his children and his fellowmen for an unfulfilled promise from his employer" and is "a traitor to his God, his country, his family

and his class." 418 U.S. at 268, 94 S.Ct. at 2773. Judgment was rendered for the union because no false statement of fact had been published. The court found that the union's labeling of the plaintiffs as "scabs" was literally true and that the accompanying definition, while extremely offensive, was opinion rather than fact. The court held that "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact" and rejected the plaintiff's claims that ordinary readers could infer from the published definition that the plaintiffs had in fact committed the crime of treason. *See also Church of Scientology v. Cazares*, 638 F.2d 1272 (5th Cir.1981); *Buckley v. Littell*, 394 F.Supp. 918 (S.D.N.Y.1975), *rev'd in pertinent part*, 539 F.2d 882 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

And *see Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In *Greenbelt*, the defendant published accounts of city council meetings at which some of the speakers described the plaintiff's behavior as "blackmail". The plaintiff contended that the use of the word "blackmail" was libelous in that it imputed the commission of a crime (which is precisely what Rayzor contended in this case). However, the court held the publication nonactionable under the First Amendment because the word blackmail "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." The same reasoning and interpretation in *Greenbelt* is applicable and controlling here. 398 U.S. at 14, 90 S.Ct. at 1541. *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1970) and *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied, sub nom., Edwards v. New York Times Co.*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), hold to the same effect which is that so long as the article in question fully sets forth its factual basis for its opinion, even very strong descriptions of an individual or epithets will be protected.

As in the cases above cited, the two Dallas Morning News articles involved here contained no false statements of fact, but contained only opinions and characterizations, including the use of the words "alleged threats." There is no liability for libel.

█ Special Issue six of the court's charge asked the jury with respect to the August 17, 1979 article, if the article "had the effect of causing ordinary persons reading the same to believe any of the following about the Plaintiff, J. NEWTON RAYZOR?"

"(a) That Rayzor threatened the life or physical well-being of Hermas Miller;" to which the jury answered, "Yes".

"(b) That Rayzor threatened the life or physical well-being of John Carter;" to which the jury answered, "No".

"(c) That Rayzor threatened to cause Miller to lose his job;" to which the jury answered, "Yes".

"(d) That Rayzor threatened to cause Carter to lose his job;" to which the jury answered, "Yes".

"(e) That Rayzor had committed a crime;" to which the jury answered, "Yes".

"(f) That Rayzor had been implicated in or investigated for improper conduct with regard to North Texas State University or the North Texas State University Educational Foundation;" to which the jury answered, "Yes".

The jury then found, in Issue No. 7, that the article was false with respect to items (a), (b), (c) and (e), but was not false as to items (d) and (f). It then found, in Issue No. 8 that as to items (a) and (e) the article was "libelous". Those items concerned a threat by Rayzor on Miller's life or well-being and that Rayzor had committed a crime.

As to the December 8, 1979 article, the same general questions were asked the jury, Issue No. 9 asking if the jury found that that article had the effect of causing ordinary persons reading the same to believe any of the following about Rayzor; No. 10 asking if the article was false with regard to any items listed in No. 9, and No. 11 inquiring if any such "item" was "libelous". The individual questions contained in these issues varied some from those asked in Issues No. 6, 7, and 8, but those questions generally were the same, and again in Issue No. 9, the jury found that ordinary persons reading the article would believe that Rayzor threatened the life or physical well-being of Hermas Miller, but not that Rayzor had committed a crime. In answering the individual "items" in No. 10, they found that the article was false with regard to the inquiry if Rayzor threatened both Miller's and Carter's life or physical well-being, that Rayzor had caused Miller to lose his job, and that Rayzor had committed a crime. In Issue No. 11 the jury found "libelous" the "item" inquiring if Rayzor threatened the life or physical well-being of Hermas Miller, but answered all of the other items in No. 11 in the negative.

Appellants argue, and we agree, that the questions or the items contained in Issues 6 through 11, mentioned above, have no basis whatever in either of the two News articles themselves. These questions about the nature of the implications or interpretations placed on the two articles by the reader are the result of the appellee's and the court's speculation. Rayzor and his counsel had implied, and tried to convince the jury, as they did, that the articles had evil connotations and constituted threats of physical violence.

No words in the article state in any manner that Rayzor's words to Miller and Carter constituted a crime or was a threat on the life of either or a threat of physical violence of any kind. The articles referred to them as alleged threats and then accurately quoted Miller's words describing Rayzor's call. There are many kinds of threats, some benign and some of a more violent nature, threatening harm to life, limb or property. The News' articles in no way stated or indicated that Rayzor threatened Miller's life, his physical well-being or his job, or that there was any crime involved. The articles merely quoted accurately Rayzor's own words, as the jury

found, and referred to them as "alleged threats". As a matter of law, Rayzor proved no cause of action; his complaint amounts to no more than a contention that the News failed gratuitously to embellish his own words by stating different opinions about Rayzor's intentions. Rayzor went to the jury denying that he had ever said, "I'm going to get your ass. The worm has turned and I'm going to hire someone to get you," or words to that effect. Then, after the jury found in effect that he did in fact utter such words, Rayzor attempts to escape this finding by claiming that the News should have published even more opinion—an opinion about words that Rayzor claims not to have uttered in the first place.

■ The jury's unfavorable answers to just two of the many sub-parts of issues six through eleven concerning various interpretations of the articles cannot support any constitutional judgment in Rayzor's favor. First, tested against the constitutionally protected statements of opinion in *Letter Carriers v. Austin, supra,* and *Buckley v. Littell, supra,* the News' use of the words "alleged threat" is not sufficiently factual to form the basis of any cause of action for libel. Instead, the words "alleged threat" constitute a fully protected characterization. Here, as in *Buckley,* the words about which Rayzor complained, "alleged threat," are referable to a whole range of meanings and characteristics. The difference of opinion between Rayzor and the News regarding what is a threat, an alleged threat or a possible threat cannot give rise to recovery by the one against the other in this case.

Here the trial court not only speculated as to the meanings of Rayzor's proven statement but also adopted Rayzor's speculation as to the meanings of his proven statement and suggested these meanings to the jury in the charge. There was no evidence to support the jury's findings as to these "alleged threats". The imposition of liability on the News for its use of the words "alleged threat" and "possible threat" would strip away the protection which the First Amendment affords all citizens' opinion.

Also, the defamatory "implications" about which Rayzor complained and on which he requested special issues were based on the News comment on fully disclosed, accurately stated underlying facts. Rayzor's statements to Miller were not taken out of context and blown out of proportion; they were quoted in connection with the story, in both articles, of the ongoing investigation into the University and Foundation affairs, the resignation of President Nolen and the firing of three other University officials. Rayzor's proven statement to Miller and his admitted conduct "bristled with ambiguities," as in *Time, Inc. v. Pape, supra.* Also, as in *Time, Inc. v. Pape, supra,* "it is hard to imagine a test of 'truth' that would not put [the News] virtually at the mercy of the unguided discretion of a jury."

We hold that there was no evidence whatever, or certainly insufficient evidence, to support the submission of Issues 6 through 11, that they were based entirely on speculation, and constitute a comment on the weight of the evidence, and that the answers thereto cannot support a judgment in appellee's favor. Appellee Rayzor argues that the jury's findings are supported by the articles themselves and cite no other evidence to support such findings. As stated above, we simply do not agree with this argument.

■ The next question this court has to decide, which question is raised in appellant's points of error 5 through 9 in their original brief, is whether Rayzor is a private individual for purposes of bringing this libel suit, as he claims, or is a "vortex" public figure, as appellant's claim. This question is vital because the test for liability for libel is considerably different. If Rayzor is considered a private individual in this case, then, under *Gertz v. Welch, supra,* and *Foster v. Laredo Newspapers, supra,* the test of liability is one of simple negligence. As stated in *Foster, supra,* a private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as compensation for *actual injury upon a showing that the publisher or broadcaster knew or should have known that the*

*defamatory statement was false* (Emphasis ours). Also, the Texas Supreme Court in *Foster v. Laredo Newspapers, supra,* said: "In addition, the liability of a publisher or broadcaster of a defamatory falsehood about a private individual may not be predicated upon 'a factual misstatement whose content [would] not warn a reasonably prudent editor or broadcaster of its defamatory potential.' *Gertz v. Welch, supra,* [418 U.S.] at 348, 94 S.Ct. at 3011."

On the other hand, if Rayzor is considered "a vortex public figure" in this particular case, his burden is far greater. In such case he must prove that in publishing the alleged defamatory article, the News acted with actual malice—that is with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 12 L.Ed.2d 83 (1964); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Associated Press v. Walker,* issued the same day as *Butts,* 388 U.S. 130, 165, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967); *Gertz v. Welch, supra.*

■ The trial court in this case found that Rayzor was not a public official or a "vortex public figure" as defined in *Gertz v. Welch, supra,* but was instead simply a private individual. Accordingly, the court submitted the liability issue as to both News articles on simple negligence, by asking, improperly we think, whether the appellants here, in publishing the articles, failed to use that degree of care which would have been exercised by a newspaper reporter and publisher of ordinary prudence under the same or similar circumstances. As is the case with questions of privilege generally it is for the trial judge in the first instance to determine whether the proof shows the plaintiff in a libel case to be a "public official." *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

■ Even if, as the trial court found, Rayzor was to be considered a private individual for purposes of this case, we think the negligence issues were incorrectly submitted and were erroneous. As we have pointed out, *Foster v. Laredo Newspapers,*

*supra,* held specifically and clearly that the test of liability for libel of a private individual is ordinary negligence. However, it also held that liability may be established only upon a finding that the publisher or broadcaster knew or should have known that the defamatory statement was false *and that it must be shown that the defamatory falsehood is not predicated upon "a factual misstatement whose content [would] not warn a reasonably prudent editor or broadcaster of its defamatory potential."* (Emphasis ours), citing *Gertz v. Welch, supra.* This matter was not submitted to the jury, as it should have been. Thus, even if Rayzor were properly considered a private individual in this case for purposes of suing for libel, we hold that the trial court's submission of the negligence theory, under *Foster, supra,* was incomplete and incorrect.

■ We also hold, regardless of Rayzor's status as a private individual, that the evidence is insufficient to support the jury's finding in Issues 12 and 13 that appellants were negligent in publishing either of the August 17 or December 8, 1979 articles. Without detailing the voluminous evidence in this case, which we have carefully read, it is clear that there was not sufficient probative evidence to support affirmative findings to Issues Nos. 12 and 13, and that such answers are also against the overwhelming weight and preponderance of the evidence.

■ However, it is our further belief, and we so hold, that for purposes of suing for libel in this case, Rayzor was not a private person, but was instead a "vortex public figure" as defined in *Gertz, supra.*

Appellants contend also that Rayzor was a public official, but we reject this contention. There is no evidence that he was either an elected or appointed public official. He was a member of the Board of Trustees of both the Development Board and the Educational Foundation, but these were private bodies, organized to assist NTSU.

The facts shown by the record upon which the holding that Rayzor is a "vortex

public figure" is based, are fully stated in the forepart of this opinion which gives the factual background for this case. We shall here only very briefly restate them. Rayzor was originally a member of trustees of the Board of Development for NTSU, then a member of the Board of Trustees of the NTSU Educational Foundation, which replaced the Board of Development. He was very actively interested in the affairs of NTSU, and as the record vividly reveals and as we have earlier stated, after his friend C.C. "Jitter" Nolen resigned because of investigations into alleged fiscal wrongdoing, and three of his closest allies at NTSU were fired by the new acting president, he thrust himself right into the middle of the ongoing controversy. He spent the early morning hours of July 22, 1979 calling many people who were involved in this controversy and it was during this early morning phone binge that he called both Carter, the acting President of NTSU and Hermas Miller, Vice-President for administrative affairs. Shortly after this, he personally called a meeting of those formerly allied with "Jitter" Nolen, to discuss the "bad publicity", and then hired counsel to represent the three vice-presidents fired by Carter, as well as others. Two of those attorneys employed by him at that time represent Rayzor in this suit and on this appeal. Quite frankly, this court is at a loss to see what else Rayzor could have done to inject himself into this "vortex", or this swirling controversy.

"Vortex" is defined in Webster's Seventh New Collegiate Dictionary as a whirlpool, or a whirlwind, anything like a whirl in its rush, catastrophic power.

As previously stated, *New York Times v. Sullivan, supra,* holds that before a publisher or broadcaster may be held liable for libel of a public official that actual malice must be shown, that the publisher or broadcaster must have known at the time that the defamatory statement was false or must have acted with reckless disregard as to whether it was false or not. That rule was extended to cover "public figures" in *Curtis Publishing Co. v. Butts, supra, Associated Press v. Walker, supra,* and *Gertz v.*

*Welch, supra.* In *Gertz,* the United States Supreme Court was called on to decide whether an attorney representing a murder victim's family in a civil suit against a police officer, who was convicted of murder, was a "public figure." The basis for the libel suit was a magazine article in connection with the murder incident which falsely (1) implied that the plaintiff had a criminal record, (2) charged that the plaintiff was a "Leninist" or a "Communist-fronter," and (3) identified the plaintiff as a former official of a Marxist organization. In determining whether Gertz, the attorney representing the civil plaintiff in the damage suit, possessed the necessary characteristics of a "public figure," the court observed that "public figures" fall into two categories: "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. *More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."* (Emphasis added), 418 U.S. 323, at 351, 94 S.Ct. 2997, at 3013. *See also Foster v. Laredo Newspapers, supra.*

We hold that under the facts of this case as reflected in the record, heretofore referred to, and by virtue of *Gertz v. Welch, supra,* it is clear that appellee Rayzor thrust himself into the vortex of the public issue involving North Texas State University and engaged the public's attention in an attempt to influence its outcome. The trial court should have so held.

It was therefore incumbent upon Rayzor to show actual malice on the part of appellants in publishing these two articles, that is that they published the articles knowing they were false or acted with reckless disregard as to whether they were false or not.

Reckless disregard of falsity means the publisher "in fact entertained serious doubts" about the publication's truth at the time of publication. *St. Amant v. Thomp-*

*son,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), or that he acted with a "high degree of awareness of ... probable falsity" of the publication, *Gertz v. Welch, supra,* 418 U.S. at 332, 94 S.Ct. at 3003. The record contains no such evidence of subjective awareness of falsity on the part of either of these appellants.

While still on the subject of malice, it must be pointed out that the trial court did not actually submit this case with respect to the alleged libel itself on a malice theory, but submitted it instead on a negligence theory. Malice was defined and an issue thereon (No. 16) submitted only with respect to exemplary damages. This was also reversible error, as heretofore stated. Since we have held that Rayzor was a "vortex public figure" the questions should have been whether the appellants, in publishing these articles, acted with actual malice, as defined by the United States Supreme Court, and the jury should have been instructed that appellee Rayzor was required to prove actual malice not by a preponderance of the evidence but by clear and convincing evidence. See *Gertz v. Robert Welch, Inc.,* 471 F.2d 801, 807 (7th Cir.1972), *rev'd on other grounds,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Long v. Arcell,* 618 F.2d 1145 (5th Cir.1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808, (1981); *Times-Mirror Co. v. Harden,* 628 S.W.2d 859 (Tex.Civ.App.—Eastland, 1982), no writ.

■ We have searched this record extensively and diligently for evidence of malice on the part of appellants Golz and A.H. Belo Corporation, publisher of the News, and find none. There was simply no evidence to show that the News published the article knowing or believing that they contained false and defamatory statements regarding Rayzor or that either or both of appellants acted in reckless disregard of whether the articles contained false and defamatory information or not. The record shows beyond a doubt that Golz, a reporter of some twenty-four years experience, including ten years as an "investigative reporter" checked and double checked his sources of information, talking to Carter, Miller, Rayzor, Texas Ranger Moore, and others. Rayzor simply denied making any threats, told Golz to check with Carter and Miller, and even told him that the story about the Texas Ranger investigation of the so-called threatening phone calls would make a good story. We hold that evidence of malice was totally lacking.

Appellants 11th, 12th and 13th points of error assert error on the part of the trial court with respect to the jury's award of $1,000,000 actual damages against both appellants, and $1,000,000 exemplary damages against appellant Belo Corporation. The contention is that there is no evidence, or insufficient evidence to sustain such awards and that both the awards for actual and exemplary damages are grossly exorbitant and excessive. For the reasons stated, we sustain these three points of error also.

■ We point out first that if Rayzor, for purposes of this case, were a private person and not, as we have held, a public figure, that he would be limited to compensation for actual injury. Neither would a private individual seeking libel damages be entitled to exemplary damages, unless he proved malice. See *Gertz v. Welch, supra,* and *Foster v. Laredo Newspapers, supra.* In *Gertz, supra,* the United States Supreme Court said: "It is therefore appropriate to require that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved. It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury...."

"We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation."

We also find and hold that both the $1,000,000 award for actual damages and the $1,000,000 award for exemplary damages are unsupported by competent probative evidence, and certainly not supported by sufficient probative evidence. Appellee offered no substantial evidence, other than

his own testimony, of any loss because of embarassment or humiliation. He expressly admitted that he "can't name anyone" who thinks less of him because of the articles. He offered no testimony that anyone had told him that he thought the article meant either that Rayzor had threatened to kill or physically harm Carter or Miller or that Rayzor had committed any crime. He testified that a convenience store clerk asked him if he was "the nut that called (United States) President Carter late at night . . . at the White House," and that a friend of his responded to Rayzor's request to review the August 17th article by saying that it "[l]ooks like they are trying to make you out to be the Cullen Davis of Denton." A former mayor of Denton, who was a friend of Rayzor's, testified, over objections, only that he had heard that Rayzor appeared to be "some sort of violent person or at best . . . some kind of nut *if in fact* he (Rayzor) made the published statement . . . (to Miller)." (Emphasis supplied).

Appellee offered no evidence of financial injury; his assets, which were impressive, increased steadily from $10,309,000 in 1978 to $10,638,277 in 1979 to $10,658,108 in 1980. His income rose from $325,000 in 1978 to $366,461 in 1979 to $371,631 in 1980. He admitted that he could not point to any actual dollar loss he had suffered because of the articles.

Despite this state of the record, and this lack of proof of actual injury or loss, the jury awarded him $1,000,000 in "compensatory" damages and $1,000,000 in exemplary damages. The jury was obviously motivated by something more than evidence in this case, because that was lacking. We believe, from the record as a whole, that this massive award of damages is the result of passion and prejudice against newspapers in general and this one in this case in particular. It cannot stand.

The United States Supreme Court has repeatedly recognized that the prospect of excessive damage awards, in wholly unpredictable amounts unrelated to the extent of actual harm caused, induces intolerable media self-censorship. "The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute. . . . Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to ·public criticism is an atmosphere in which the First Amendment freedoms cannot survive." *New York Times v. Sullivan,* 376 U.S. at 277–78, 84 S.Ct. at 724; *Gertz v. Welch, Inc.,* 418 U.S. at 348–50, 94 S.Ct. at 3011–12.

Rayzor offered no evidence of any emotional or physical reaction to the articles, except his self-serving claim that he was "shocked and stunned" by the August 17, 1979 article. He never consulted either a physician or a professional psychologist or a counselor. Moreover, he offered no evidence of any actual injury to his reputation. In view of this evidence, or lack thereof, we hold that the award of $1,000,000 actual damages is unsupported by competent probative evidence and is beyond all reason.

We also hold that the $1,000,000 punitive damages award is not supported by any evidence, from our review of this entire record, or, alternatively, is certainly not supported by sufficient evidence of probative force. This total award, including the $1,000,000 for exemplary damages, shocks the conscience and is so unreasonable as to indicate the entry into the jury's deliberations of passion and prejudice, or matters not revealed by the record in this case.

The courts, both federal and state, do not look with favor on exemplary damages awards in libel cases because such awards, usually unbridled and unrestricted by anything but the jury's own feelings and conscience, tend to inhibit the exercise of First Amendment rights. In *Gertz v. Welch, supra,* the court required even private libel plaintiffs to prove actual or constitutional malice in order to recover more than compensatory damages. *See* also *Electrical Workers v. Foust,* 442 U.S. 42, 50–51, n. 14, 99 S.Ct. 2121, 2126–27, n. 14, 60 L.Ed.2d 698 (1979); *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

There is another reason why the award for exemplary damages cannot stand. In this case, we have held, after reviewing the entire record, that there was no evidence of actual malice, that is that the News published the two articles knowing they were false or with reckless disregard as to whether they were false or not. Before exemplary damages may be awarded, the libel plaintiff, whatever his status may be, must plead and prove malice. The purpose of exemplary damages is punishment. In this case, punishment of the News for its accurate reporting of Rayzor's threats, whatever they mean, is inappropriate and impermissible.

For all of the reasons stated we reverse and render the judgment of the trial court and order that appellee Rayzor take nothing as to either of the appellants herein.

In the event we be in error in rendering this judgment, we note, for guidance of the trial court in the event of a re-trial, that in addition to our sustaining the first thirteen points of error referred to above, we also sustain, without further discussion, appellant's points of error 14, 15, 16, 17, 20, 21, 23, 24, 25, and 29. All other points of error are overruled, also without discussion.

APPENDIX A

The Dallas Morning News

Friday, August 17, 1979

NTSU booster

quizzed about

alleged threat *

By EARL GOLZ and STEWART DAVIS

°The Dallas Morning News, 1979

A Texas Ranger quizzed a trustee of the North Texas State University Educational Foundation Thursday about early-morning telephone calls in which he allegedly threatened two NTSU officers who were cooperating with state investigators looking into fiscal irregularities at the Denton school.

J. Newton Rayzor, wealthy real estate and ranch developer, was questioned in his Denton office by Texas Ranger Charles Moore about telephone calls made to John L. Carter Jr., acting NTSU president, and Hermas Miller, vice president of administrative affairs.

Rayzor denied threatening the two officials.

"Hell no, I didn't threaten them. I passed information on to them," Rayzor said of the calls he made about 3 a.m. July 21.

Asked what information he gave to the two officials, Rayzor said, "Why don't you ask them?"

CARTER AND Miller were called the morning after Carter fired three NTSU vice presidents, after having been given the authority to do so by the board of regents.

The regents had met in executive session to discuss what additional actions should be taken in response to a House General Investigating Committee report that said state auditors had found illegal diversion of state funds and donors' gifts involving the university's private educational foundation.

Moore said he "made an inquiry into" the alleged threats and couldn't consider them "actual threats."

"They were sort of a derogatory nature," Moore said. "Probably a little bit bordering on threats."

The Ranger said Carter doesn't "want to pursue" a complaint against Rayzor "at this stage if they don't receive any more calls that would be considered threats."

Carter said Rayzor told him during the phone conversation "they were going to get a group to look into it (NTSU firings) and investigate the situation. They were going to hire an outside (law) firm to look into the situation and check up on us—get to the bottom of it."

Carter said Rayzor also told him "they would find out whether we would stay in our position or not." Carter was named acting president to replace C.C. (Jitter) No-

---

* In subsequent editions of the paper, this article ran on page 2, with the headline "NTSU boost-er denies calls were threats." See PX 7; DX 42; S.F. 446–47.

len, who resigned on the eve of his testimony before the House General Investigating Committee.

Miller said Rayzor, whom he had never met before, called him at 3 a.m. and told him, "I'm going to get your ass. The worm has turned and I'm going to hire somebody to get you."

Rayzor, who lives in Fort Worth but maintains offices in Denton and Houston, is a wealthy booster of NTSU who worked with Nolen to try to get an educational television channel for the school. He is a good friend of Roy K. Busby, vice president of university relations and secretary to the board of regents of NTSU, who was fired July 20 by Carter.

Denton County Dist. Atty. Jerry Cobb called the Rayzor incident "bizarre" and said he had been unaware of it until questioned by The Dallas Morning News Thursday afternoon.

Earlier Thursday, the Texas Prosecutors Coordinating Council agreed in a meeting in Austin to assist Cobb in the investigation of all questionable fiscal transactions and allegations of a bid-rigging scheme at NTSU.

Cobb said Thursday he is "not going to take an active interest in the investigation, in seeking indictments ... I'm going to leave that to the prosecuting council."

"AFTER THE indictments are returned ... a decision would have to be made about whether I am going to personally prosecute any or not prosecute any," he said.

Atty. Gen. Mark White's office also is investigating the university's relations with the educational foundation to see if a civil suit might recover some of the tax funds that may have been diverted into the foundation.

Special state audits showed university funds and foundation money were co-mingled and, in some instances, were spent for items that the university is prohibited by law from purchasing.

But auditors found the foundation books in such disarray that exact measures of the transactions were impossible.

In a typical case, however, they found that $3,000 was transferred from the university's center for behavioral studies to the foundation's operating fund to supplement Nolen's salary.

The Dallas Morning News

Saturday, December 8, 1979

Appointment of NTSU president obscured by secrecy, firing *

By EARL GOLZ

Staff Writer of The News

DENTON, Texas—A North Texas State University vice president who was a leading critic of the previous controversy-plagued NTSU administration has been fired by the school's new president.

But the firing last week of Hermas Miller by president Frank E. Vandiver is not official.

The reason: Vandiver did not have the authority to fire the vice president for administrative affairs because Vandiver is not officially NTSU's president.

The vote by NTSU regents last month to hire Vandiver was taken during a secret session and, therefore, under state law was illegal.

SO FRIDAY regents chairman Winfree Brown hurriedly scheduled an emergency meeting Sunday to take a public vote on Vandiver. The next regular meeting of regents isn't until February.

Vandiver, vice president and provost of Rice University, was announced as NTSU's new president Nov. 16, succeeding C.C. (Jitter) Nolen, who resigned last April in the wake of an investigation of fiscal irregularities at the university.

One of Vandiver's first acts after being named president was to fire Miller, a leading critic of the Nolen administration.

The selection of Vandiver was handled almost solely by Gov. Bill Clements' two newly appointed regents: Brown, of Midland, and Eddie Chiles of Fort Worth.

* This article appeared on page 26A of the Dallas   Morning News.

Vandiver, a 54-year-old historian, has not been placed on the NTSU payroll and wasn't scheduled to become a full-time president until next August.

BROWN SAID Friday he is "not answering one way or the other" if Vandiver would start drawing the $43,900 state funds portion of his annual salary if he is confirmed Sunday. Vandiver has said he plans to make about four short visits a month to the NTSU campus until he assumes his full-time role in August.

Sources said Brown and Chiles lured Vandiver to the NTSU job by assuring him they could raise enough private funds to supplement his state salary to total more than $70,000 a year. This salary would make him the highest-paid president of a state-supported university in Texas, topping the $66,500 given Peter Flawn at the University of Texas at Austin. Vandiver's predecessor, Nolen, was paid $58,000.

Brown said a reported maximum of $75,000 for Vandiver "is pretty damn high." He said "we are pretty much in line" with the $66,500 given Flawn.

Vandiver said he and the regents "are still sort of hammering it (supplemental salary) out," although Brown confirmed "the dollar figure has been worked out."

MEANWHILE, the rush to make Miller's firing official appears certain to light a political powder keg in Austin.

Miller's efforts to clear up the financial problems at NTSU, at the risk of being fired during the Nolen administration, endeared him to House Speaker Bill Clayton. After the house general investigating committee began looking at the NTSU situation last spring, Clayton hired Miller and NTSU legal counsel James Neill on a part-time basis to investigate fiscal irregularities in other state agencies.

Clayton, who has potential control of the purse strings of NTSU and other state-supported universities through appointments to the house appropriations committee, was upset by the Miller firing.

"IT SEEMS to me they (NTSU political forces) are trying to put too much water on the cinders," Clayton said. "It's really bad if that's what the situation is that he was fired even before the man (Vandiver) gets on the job."

"I have indicated to Hermas (Miller) that if he does leave the employment there at North Texas State and does wish to come back into state government, I would certainly recommend him if he finds some place that he would like to work, because I think he has a lot of talent and a lot of ability," said Clayton.

Miller, 44, came to NTSU two years ago after serving three years as vice president of fiscal affairs at West Texas State University. Before that he was assistant budget director in charge of schools for the State Legislative Budget Bureau in Austin for 13 years.

WHEN VANDIVER told Miller he was through at NTSU, effective Jan. 1, he offered to help him get another job, Miller said.

" 'I'll do anything I can,' " Miller said Vandiver told him. " 'I'll even write a letter recommending you ... You are doing an outstanding job and you are competent, but I just want my own people in here.' "

Although Vandiver denied it, Miller said he thinks a factor underlying his being fired was a long-standing friendship between Vandiver and the wealthy Houston family of NTSU booster J. Newton Rayzor.

Rayzor, a real estate and ranch developer, also was a strong supporter of Nolen and apparently was quite disturbed at Miller's role in ousting Nolen.

During the controversy over financial problems at NTSU last August, Miller said Rayzor called him at 3 a.m. and told him: "I'm going to get your ass. The worm has turned, and I'm going to hire somebody to get you."

THE CALL TO Miller and another early morning call that same day by Rayzor to acting NTSU president John L. Carter Jr., resulted in an inquiry by the Texas Rangers into possible threats against school officials. Ranger Charles Moore said at the time he

didn't consider Rayzor's calls "actual threats" but "probably a little bit bordering on threats."

Moore said neither Carter nor Miller wanted to file a complaint "if they don't receive any more calls that would be considered threats." Rayzor denied his calls were meant to be threats.

Brown said "to my knowledge I know nothing" about a report that Rayzor had been asked to pledge a sizable sum to Vandiver's supplemental salary, though he acknowledged that Vandiver "knows Rayzor."

Rayzor could not be reached for comment Friday.

Vandiver said he didn't "know a thing about" the report that Rayzor may supplement his salary, adding "All I know is the (Rayzor) family."

1JRMSK